JAMES HUGHES v. THE DETROIT, GRAND HAVEN & MIL-
WAUKEE RAILWAY COMPANY.

*Negligence—Injury to boy riding on foot-board of engine—Charge to.
jury—Competency of infant to testify.*

1. Plaintiff sued for injuries sustained by being thrown from the foot-board of a switching engine, which was making up and distributing freight trains in defendant's yard, by a sudden start or a sudden stop, the negligence averred being the failure of the trainmen to put him off before moving, and the rapid action in starting and stopping. The testimony was conflicting as to. plaintiff being on the foot-board, or, if there, as to his being seen by the engineer, or whether, if seen at all, he was seen *before* or *after* starting. The court ihstructed the jury not to find for the plaintiff unless the engineer actually saw plaintiff on the foot-board, in which case he should have ordered him off before start-

ing the train, and said that it was conceded that the boy was on the foot-board, and assumed the boy said the engineer saw him before starting.

*Held*, that the court erred in treating *controverted* facts as *undisputed*, and that, as the duty to keep off a child *entirely* could not be quite the same as the duty which would arise from seeing him already on a moving train, there was error in saying the plaintiff should recover if the engineer saw him, without reference to the *time* and *circumstances* of seeing him.

2. The law regarding the competency of children of tender years to testify is fully discussed, and it is held that plaintiff's competency was not shown, and the desirability of legislation suggested, which is furnished by Act No. 82, Laws of 1887, providing for the taking of the testimony of children under ten years of age, if found to have sufficient intelligence and sense of obligation to tell the truth, on their *promise* to do so, instead of upon oath or statutory affirmation, such testimony to be given such credit by the court or jury as it may appear to deserve.

Error to superior court of Detroit. (Chipman, J.) Argued October 21 and 22, 1886. Decided February 10, 1887.

Case. Defendant brings error. Reversed. The facts are state l in the opinion.

*George Jerome* (*E. W. Meddaugh*, of counsel), for appellant.

*S. E. Engle*, for plaintiff.

CAMPBELL, C. J. Plaintiff, a little colored boy, who is now between six and seven years old, and was, when injured, five years old or under, recovered judgment in the superior court of Detroit for personal injuries causing the loss of a leg and some other damage. In July, 1884, towards the close of the day, but during daylight, according to the claim of his declaration, he was on the front of a switching locomotive which was making up and distributing freight trains, and standing upon a plank step used for switchmen and brakemen to stand upon in their yard work, and, as he asserts, was thrown off by a sudden start or a sudden stop, and

run over.   The negligence alleged was the failure of the train men to put him off before moving, and the rapid action in starting and stopping.   Other facts were set up concerning the condition of the yard in which the accident happened, which ran from Hastings street across a block, and the use of it as a place of pastime by children, and some similar matters, all of which, although gone into on the trial, were finally ruled to be improper by the judge in his charge.   This final ruling was in accordance with the decision of this Court in *Chicago & N. W. Ry. Co. v. Smith,* 46 Mich. 504, concerning such premises, where it was held, in a very similar case in all its circumstances, that the company could not be held, under such circumstances, for anything less than wanton and gross negligence involving reckless misconduct.

Under the charge, as already given, the jury were directed not to find for plaintiff unless the engineer actually saw the plaintiff on the foot-board.   If so, the court held he should not have started the train while the boy was on it, but should have ordered him off; and, in giving this charge, the court said it was conceded that the boy was on the foot-board, and assumed the boy said the engineer saw him before starting.

It was not disputed, but admitted on the argument in this Court, that, if the engineer actually saw the boy on the foot-board before moving, he would be bound to use efficient care to prevent injury to him; but it is denied that he was on the foot-board, or, if so, was seen by the engineer, or any one else, in that position.   The fact that the boy himself is the only witness who says the engineer saw him renders another question important, which is how far his testimony was admissible.

Upon examining the testimony, we find that, while there are witnesses for plaintiff who swear to his being on the foot-board, they do not agree as to the circumstances or cause of his being thrown from the board.   On the part of the defense there is testimony which is not consistent with his being

there, as well as positive testimony that he was not seen if there. The declaration does not aver that he was seen, but merely that he might have been seen with proper diligence, but it does aver he was on the board and thrown off.

There was conflicting testimony as to the likelihood or possibility of seeing him on the board. He himself says he ran back and forth over it while the engine was not moving, and finally got on it just before starting, and then stayed on till he fell off. He also says he faced the engine, while the other testimony would not so indicate.

All of this shows the great importance of this particular fact, and the danger of assuming it when the testimony conflicted. So it was equally important to know whether, if seen at all, he was seen before starting, as the duty to keep off a child entirely could not be quite the same as the duty which would arise from seeing him already on a moving train. Most of the testimony indicates that there was nothing unusual in the running or stopping of the train after it started. This theory was not laid before the jury so as to call their attention to its significance.

The boy's own testimony as to how he fell off is not quite the same in the direct as on the cross-examination. On the direct, the impression he gives is that he was thrown off by a sudden starting and jerk. On the cross-examination he says he was carried forward, and in no other direction, with the engine, until near the switch, and then fell off close by the switch. Rosa Bushey, one of his witnesses, on the other hand, says the engine went back with him towards Hastings street before taking him east to the switch. Tean, another of his witnesses, swore his back was towards the engineer while he was standing on the board, and that his hands were under the hand-rail. The testimony was by no means uniform upon the important matters on which this charge bore.

The charge seemed to go upon the idea that the plaintiff's account was the one to be chiefly acted on by the jury, in

connection with his testimony concerning the engineer, and there was no other testimony which covered that matter directly. He does not swear positively that the engineer saw him, but his testimony undoubtedly tends that way, but, when all compared, leaves the time and circumstances of such seeing in doubt. Without it, as the court substantially charged, there was no case for the jury. In connection with this there was testimony of the plaintiff himself that the engineer, when he saw him, told the fireman not to ring the bell until the little fellow got off, and there is no testimony that after this warning the boy showed himself, if he did at all, to the engineer. The court committed error in treating controverted facts as undisputed, as well as in saying the plaintiff should recover if the engineer saw him, without reference to the time and circumstances of seeing him.

Passing by minor points, this makes it necessary to determine concerning the admissibility of this proof. It has been held by this Court, as well as courts generally, that the fact that a child is under seven years does not create an absolute disability to testify. This was held in *McGuire v. People*, 44 Mich. 286, and is the doctrine of the text-books. But the authorities all agree that a child cannot testify unless capable of appreciating the obligation of his oath, if he takes an oath, or of his affirmation if that is substituted. And this is upon the ground that a witness must be under some pressure, arising out of the solemnity of the occasion, beyond the ordinary obligation of truth-telling. 1 Greenl. Ev. § 367; 1 Phil. *c.* 2 (C. & H.), and notes. One or the other of these methods of attestation is required of all witnesses, children or adults, and persons unsworn cannot testify unless they prefer the other form, which in this State is under the pains and penalties of perjury.

The fact that this child was to be put under oath or affirmation was not brought to his attention at all, so as to show whether he d.d or did not understand the bearing or effect

-of it.   He merely said he must tell the truth, or he would go to hell; but, when asked about any other consequences, he showed entire ignorance, and only said that his mother told him the day before that he would go to hell if he did not speak the truth.   This is all that he said bearing on his veracity.   He was examined by counsel, and not particularly tested by the court, and the court, without making any personal examination, or certifying or in any way giving an opinion that the boy understood the nature or obligation of an oath or affirmation, left it all to the jury, to be tested by the ordinary questioning and cross-questioning by counsel.

This is what might, no doubt, be safe with many other persons besides children who usually tell the truth, and may have their truth substantially tested, whether sworn or not. But the law entitles parties to insist that all witnesses shall be put under some solemn obligation before testifying, and excludes witnesses who are incapable of understanding its sanction.   As Mr. Starkie very well explains it, this is not done because the law imputes guilt or blame to those who do not appreciate it, but because it requires the highest attainable sanction for testimony. 1 Starkie, Ev. 22.   It is not left to courts to let in everything which, in their general opinion, or in the case of the particular witness, might be safe.   Neither does it rest on any particular belief.   Any one may take the oath or obligation that accords with his own opinions, but he must do the one or the other.   And he must be able to comprehend it.   Upon this there is no conflict in the cases.   It is necessarily to be left very much to the discretion of the trial judge if he undertakes to exercise that discretion, and acts upon such an examination as satisfies his own mind.   He should conduct this examination as in his judgment will be effectual.   It cannot safely be left to counsel to make the examination.   In *McGuire's Case,* before referred to, the judge gave a careful personal examination to the child, and formed a distinct opinion of his own, founded

on that examination.   As the preliminary inquiry cannot be·
and is not under oath, there is the strongest reason for very·
careful action by the judge himself on his official responsi-·
bility.   The cases and text-books recognize this distinctly.
See 1 Greenl. Ev. §§ 367, 368, and notes; 1 Edw. Phil. Ev.
11, and notes.   In England it has been held that recent
teaching for the occasion is not in itself sufficient, because·
the knowledge thus received may not be comprehended.   1
Edw. Phil. Ev. 12; *Rex* v. *Williams*, 7 Car. & P. 320.   A.
careful judicial examination is much more satisfactory than
answers which may or may not be really intelligent.   The·
child's capacity and disposition to answer correctly and can-
didly such questioning as may be given is of the utmost con-
sequence, because even among mature witnesses it is not·
always easy to discriminate between actual knowledge and
what is accepted on hearsay and inference.   It is obviously
necessary for the court to be satisfied that the child will be·
disposed to tell the truth under some sense of obligation.

In children of tender age no reasonable person would ex-
pect a complete power of discriminating between his means·
and sources of knowledge; and more or less undesigned
coloring and misrecollection is almost inevitable.   There can
be no criminal responsibility in a young child, and the care
used must therefore be rather in ascertaining his capacity
and disposition than in impressing the terrors of the law.

We are compelled to apply the law as we find it, until
changed by legislation.[1]   But we are greatly impressed with
the practical imperfection of the present rules.   In France,
and probably elsewhere, the courts refuse to administer an

[1] Act No. 82, Laws of 1887, provides:
"That whenever a child under the age of ten years is produced as·
a witness, the court shall, by an examination made by itself publicly
or separate and apart, ascertain to its own satisfaction whether such
child has sufficient intelligence and sense of obligation to tell the·
truth to be safely admitted to testify, and in such case such testi-
mony may be given on a *promise* to tell the truth, instead of upon·
oath or statutory affirmation, and shall be given such credit as to the·
court or jury, if there be a jury, it may appear to deserve."

oath to children of tender years, and allow them to be examined without anything more than suitable cautions, leaving their statements on direct and cross-examination to be taken for what they are worth.  This seems to be a sensible proceeding, and is probably quite as efficacious as our own system, and less likely to abuse.  There is a proper desire in courts to receive such testimony as will throw light on the case, and there is no doubt that in practice children are often allowed to testify whose legal capacity to do so is very liberally construed.  It would be better, we think, to put their testimony on the more rational ground that it is calculated to be of some value, and capable, under a proper examination, of being reasonably well weighed for what it is worth.

The other points do not require much consideration.  It is possible the instructions concerning damages were open to some criticism, but the judge appears to have desired to prevent any wild estimates, and it is not very easy to be precise concerning all the elements to be considered in such a case. The charge was intended to keep out improper considerations as far as possible, and to undo some rulings made earlier in the case which were found improper.  In cases like this, however, it is not possible, after argument, to undo the effect of important testimony once in, and impressed on the jury by counsel.

For the reasons given, the judgment should be reversed and a new trial granted.

SHERWOOD and CHAMPLIN, JJ., concurred.

MORSE, J. (*dissenting*).  In this case there is ample testimony, outside of the evidence of Hughes, that the boy was standing on the foot-board of the engine in such a position as to be easily discernible by the engineer and fireman.  The foot-board was about eight feet in length, and the testimony is undisputed that he stood upon the south end of this foot-

65 MICH.—2.

board. The evidence of all who claimed to have seen him there before the accident places him upon that end of the board.

The measurements and experiments show that he could have been seen from the front cab-window unless he stood in a space in the center, not over three feet in width, leaving from two and one-half to three feet of each end of the foot-board visible, so that a boy siting down could have been observed from this cab-window.

The boy himself testifies that the engineer looked at him when he got on the board, and before the engine started, and that the engineer recognized that he was on by saying to his fireman "not to ring the bell until the little fellow gets off."

In order to prevent a recovery in this case it is necessary to get rid of the boy's testimony; and an earnest argument was directed to this Court to establish the proposition that the age of the child, and his ignorance of the nature of an oath, as developed by his preliminary examination in the court below, should have led in that court to the rejection of his testimony. I, for one, take no stock in this proposition, and have but little patience to examine such an argument. I cannot consent for a moment to any rule of law, however well fortified by remote or later decisions of the courts, that will practically exclude the testimony of children under seven years of age, and leave them, in many cases, without redress for wrongs committed upon them.

Our criminal annals are full of cases where little girls under seven years of age are outraged and maltreated by fiends in human form. They are entitled, above all others, to the thorough and complete protection of the law; and I shall place no obstacles in the way of the punishment of the miserable and depraved beings who are capable of such crimes against nature and the law. If an extraordinary intelligence is required in the child, if she must understand the nature of an oath or affirmation, and that without any recent teaching,

as one English case seems to hold (*Rex v. Williams*, 7 Car. &
P. 320), before she can testify, then there is necessarily an
absolute prohibition against her testimony; and any injury
to her, unless some one is present to witness the act except
the perpetrator, must go unpunished and unredressed.

The most ignorant and depraved adult, under all the
authorities, can testify under oath or by affirmation, and no
preliminary examination to test his intelligence is required
or provided for.  There can be found but few, if any, chil-
dren of the age of this colored boy that have any idea, without
teaching, of the nature of an oath.  Though we may take
pains to instruct our children from the moment they can
prattle that they must tell the truth, it is seldom, if ever,
that we take the trouble to instruct our infants in the practice
of the courts, or the nature or the obligations of oaths there
taken.   But if an injury should happen to one of them,
which ought to find redress in the courts, we would be apt,
and I think we would have the right, to then instruct the
child, not only to tell the truth, but of the nature and obli-
gation of the oath which it would be required to take.

The object of all judicial inquiry is to ascertain and deter-
mine the truth, and an oath is but a means to that end.   It
is not necessary now that an adult should believe in hell, or
any other punishment after death, in order to be a competent
witness; and the catechism of a child upon that subject, as
was done in this case, is not only ridiculous, but absurd.
Children should have at least equal rights with adults in
this respect.

There can be but little, if any, trouble, in these cases, of de-
termining the truth or falsity of the testimony of a child.
The danger of perjury comes from the examination of older
and more experienced persons, who take the oath at once,
without fear and without question.   The proper way, in my
judgment, is to examine the child upon the subject of its
intelligence, and, if found capable by the trial judge of un-

derstanding the nature and force of the oath or obligation to be taken, after proper instruction by the court as to the duty of telling the truth, and the consequences attending falsehood, the oath should be administered, and the testi-mony received by the court, to be tested and weighed by the jury according to the usual standards.

In the present case, the boy evidently understood that he must tell the truth, and that he would be punished here for a falsehood, though he did not know what the punishment would be, and thought that God would inflict it. Who will say that he was not right even in this, or deny that Deity does not in this world find means to punish the evil-doer with the pangs of conscience, if not otherwise.

After the preliminary examination, the court permitted the boy to be sworn, and said:

"I don't know, gentlemen; I think I will have to receive the testimony for what it is worth. The jury can judge as to the competency of his statement. My experience and obser-vation has been—and it has been quite extensive—that where children have to tell a complicated story, if they make mis-takes, the mistakes are very apparent to the jury. You have the power of cross-examination, and such cross-examination, if conducted kindly and fairly, as I know it would be in this case, will lay before the jury quite accurately the intelligence of the boy, and the degree of credit that he ought to receive."

I think the court did not err in this action, and that his remarks were sound, in common sense and in law.

The boy was closely and keenly cross-examined by compe-tent and shrewd counsel, and displayed an intelligence upon such examination not surpassed by any witness, and not equaled by some. And his evidence impresses me with its truth. His story of the transaction is candid and straight-forward throughout, and unusually intelligent in its detail. The jury believed it, and there is, in my opinion, absolutely no reason for shutting it out of the case. If we are to dis-card the simple, unaffected narration of this child because he is not of an age to be punished criminally for telling a lie,

and yet to receive in all cases, as we do, the evidence of suspected and condemned felons, subject only to the credence that a jury may give them, then the law is not, as I understand it, a safeguard and a protection to the innocent, and a terror to the evil-doer.

I find no error in the proceedings, and believe that the judgment is right as it now stands.