[Criminal No. 124. Filed February 23, 1898.]

[52 Pac. 368.]

## SAMUEL DONNELLEY, Defendant and Appellant, v. TERRITORY OF ARIZONA, Plaintiff and Respondent.

1. CRIMINAL LAW—AGGRAVATED ASSAULT—PRIEST'S RIGHT TO PUNISH CHILD—REQUEST OF PARENTS.—A patriarch or priest, simply because he is such, cannot whip a child capable of appreciating correction, at the request of parents.

2. SAME—SAME—PUNISHMENT OF CHILD—EVIDENCE—REQUEST OF PARENTS—MITIGATION.—Under an indictment for aggravated assault, the intent with which the act was committed being an element of the

crime, it was error for the trial court to exclude evidence that the punishment of the child was at the request of parents, as it was proper for the jury to consider such evidence in determining whether defendant was guilty of simple or aggravated assault.

3. SAME—SAME—WITNESSES—CHILD—QUALIFICATION — KNOWLEDGE OF NATURE OF OATH—CHARACTER OF TESTIMONY.—It is error for the trial court to permit a child six years and eleven months old, upon whom it is alleged defendant made an assault, to testify, where it appears that he has little knowledge of the nature of an oath or the consequence of falsehood, except that he answered that people who told a lie would go to jail, especially where his story corroborates strongly his mother's, under whose instruction as to being a witness it is admitted he has been.

SLOAN, J., dissenting.

APPEAL from a judgment of the District Court of the First Judicial District in and for the County of Cochise. J. D. Bethune, Judge. Reversed.

The facts are stated in the opinion.

C. W. Wright, for Appellant.

C. M. Frazier, Attorney-General, and W. H. Barnes, for Respondent.

STREET, C. J.—1. The appellant, Samuel Donnelley, was indicted by the grand jury of Cochise County, charging him with an aggravated assault upon a six-year-old child, in that he attempted to commit violent injury upon the person of a child. The evidence shows the assault consisted of ducking the child in a pond of water, the truth of which stood admitted, and whipping the child, which, as a fact, was contested and denied. On the summit of Huachuca range of mountains, in Cochise County, is a mining camp known as the "Copper Glance Mining Camp," sometimes known as "Donnelley's Camp." It is composed of a community of people who are shown to be under the spiritual and patriarchal control of the defendant, Samuel Donnelley, to the extent that they make him the "Moses" of their community, their ruler and guide, surrendering to him the control of their property and persons, and the management of their children, calling him their "spiritual teacher." The Copper Glance Mining Community is isolated from the rest of the world to the extent that no

wagon-road approaches the locality nearer than eight miles. The balance of the way is a trail, passable only to travelers on foot or on the backs of animals. This community of religious zealots have so completely surrendered themselves to the control and management of the defendant, Donnelley, that mothers testify they had surrendered the right of punishment of their children to the defendant, and instances were testified to in which he had punished children of the tender age of eleven months. The evidence in this case shows that the defendant, Donnelley, in the month of June, 1896, took a boy six years old and ducked him in a pond in the presence of the community, or a number of the members of the community. The ducking is admitted, but the intensity or severity of the same is in dispute. The mother of the boy testified that Donnelley tied a rope around the boy's body and threw him into the pond as far as he could throw him, and then, by means of the rope, pulled him back again; he threw him into the pond, and pulled him out, and this he did three times. The defendant and six other witnesses, who saw the transaction, testified that no rope whatever was used, but that Donnelley picked the boy up, and, with one foot on the bank of the pond and the other on a rock projecting above the water, dipped the boy into the pond but once, and that the water in the pond at that place was shallow. The mother and the boy both testified that after the ducking Donnelley whipped the boy with a buggy-whip,—the mother said, to the extent that welts were raised upon the boy's body. The evidence of one Parker tended to show that Donnelley whipped the boy after the ducking was over, although Parker did not claim to have seen it done. Donnelley and his six witnesses denied the whipping *in toto,* and said that nothing of the kind happened. The jury found Donnelley guilty as charged in the indictment.

There were many assignments of error, but we feel that we can dispose of the matter by determining the correctness of but one or two questions embodied in the assignment of errors: First, as to whether the court erred in refusing evidence to show that the mother of the child gave her consent to Donnelley to punish the child, or whether Donnelley did the acts charged in the indictment upon the request of the mother of the child, and the instructions of the court bearing

upon that point; secondly, the question as to whether the child, who was sworn and gave evidence, should have been allowed to testify in the case. The district court, in the trial of the indictment, refused evidence of the instructions from the mother to Donnelley as to how she wished the child punished,— the court ruling that he would allow proof as to the mother's request to Donnelley to correct the child, but would not allow proof that she had requested him to put the child into the pond, either in justification or mitigation of Donnelley's act,— and ruled that it was no excuse for him to show that she requested him or allowed him to put the boy into the pond. The court, also against the objection of defendant, permitted the child, who was then six years eleven months old, to be sworn and give testimony as to what took place eleven months before, when the child was six years old.

It is a principal of common law, which remains with us to the present day, that the parent may in a reasonable manner chastise his child, a schoolmaster his scholar, and also that those who stand *in loco parentis* may chastise children under their control; provided, always, that the chastisement be reasonable. A brother who provides a sister fifteen years of age with lodging, clothing, and schooling may inflict moderate correction. *Snowden* v. *State,* 12 Tex. Civ. App. 105, 41 Am. Rep. 667. A stepfather who supports his stepchildren is *in loco parentis,* and may reasonably chastise the child to enforce his authority. *Gorman* v. *State,* 42 Tex. 221. But there is no rule that a patriarch or priest, simply because he is patriarch or priest, can whip a child at the request of parents. This rule, also, is limited to children who are capable of appreciating correction, and it had been ruled that it did not extend to infants only two and one-half years old. The authority of a teacher extends only to the infraction of rules or misconduct while the child is under the direct charge of the teacher. "Though a schoolmaster has, in general, no right to punish a pupil for misconduct committed after the dismissal of school for the day, and the return of the pupil to his home, yet he may, on the pupil's return to school, punish him for any misbehavior, though committed out of school, which has a direct and immediate tendency to injure the school or subvert the master's authority." *Lander* v. *Seaver,* 32 Vt. 114, 76 Am. Dec. 156.

The doctrine of punishment, as applied to the pupil by the teacher, has never been extended to the spiritual advisers of a community by the common law. It does not appear that Donnelley was standing in the rôle of a schoolmaster or teacher, or had the direct charge of the child, but was called "teacher" by the community, in the sense that a witness testified: "He was the teacher of all of them,"—the teacher of the parents, and, being the teacher of the parents, was the teacher of the children.

The district court was right in holding that, even though the mother requested Donnelley to punish the child, such request could not be a justification, even though she had specified the particular way in which she desired the child punished. But we think the court failed to make a distinction between justification and mitigation, and the evidence ruled out and the instructions given had a tendency to take from the jury the consideration of the lesser offense included in the greater. An assault is defined by the statutes of Arizona "to be the unlawful attempt, coupled with the present ability to commit a violent injury upon the person of another." Pen. Code, par. 382. Paragraph 390 of the Penal Code makes such an "assault by an adult male on a child an aggravated assault." The lesser is included in the greater, and any evidence in mitigation of the graver offense, to show that the lesser has been committed instead of the greater, is legal evidence. Whipping is in itself punishment; and if an adult male should whip a child without any authority or license, he would be committing an assault upon the child; and, under the statutes of Arizona, the assault would be an aggravated one if the whipping was of any severity at all, or different from the most light and trivial chastisement. Whipping has always been considered an assault, and can only be justified under the law by the relation which is sustained between the child and the party administering the punishment. The only refreshing thing about a whipping is the memory of it in after years. Not so, however, with ducking in a pond. Thousands upon thousands of boys six and seven years of age refresh themselves in the sports of ducking themselves in ponds. It is not in its nature a punishment. The people the world over delight to bathe and duck themselves in water, and the size of the pond is not a feature to be taken into considera-

tion. The ocean itself is not too large for such occasions, nor can it be said that ducking in water is an improper or unusual way of chastising children. The common law, for certain offenses, recognized ducking as a punishment; but it is to be regarded as a punishment only as to the manner in which it is administered. A child may be put in such mortal fear by being ducked, even in a very small body of water, as to be an injury to its health and body. No one has a right to administer punishment by water in such a way as to bring fright, horror, and dread to the child; and the evidence in this case is that the child was severely frightened, and that he made a great outcry; that he struggled, and held so closely to the defendant Donnelley while Donnelley was trying to put him into the water that it was with difficulty that Donnelley could do so; that the child clutched at everything in sight, and grabbed hold of the bottom of the pond, so that, when he was brought up, his hands clenched the mud and gravel of the bottom, and he brought up handfuls thereof. Under these circumstances, it was within the province of the jury to determine whether it was an aggravated assault, or whether it was only a simple assault. Had the ducking been administered by the mother, it is quite reasonable to suppose that, although the child made an outcry, and although he struggled not to be put into the water, the jury would have found it a reasonable administering of punishment upon the part of the parent, who had a right to administer the punishment; or, if the punishment was unreasonable, that it was but a simple assault, or assault and battery.

The assumption of Donnelley to punish was a violent one, as he stood in no such relation towards the child as would give him the right to do so under the law. But there is a question of intent to be determined, which may be largely affected by the understanding of Donnelley as to his right to punish the child, derived from the consent or instruction of the parent. The indictment alleges that there was an attempt to commit violent injury. Such, also, is the language of the statute. Considering the relations which Donnelley sustained to the community, and the practices which he had been indulged in, at the request of the parents, in punishing their children, makes it appear a right to admit such evidence as would tend to show that he was not doing this violently and

of his own accord, but doing it under what he supposed to be a color of right, and with an intent to reasonably accord to the wishes of those who would have a right to do the very act which he did. For the court to deny the defendant that privilege would be to take from the jury the consideration of a fact and a condition which it was the right of the defendant to have the jury consider,—whether he was guilty of simple assault or aggravated assault. In this particular we think the district court erred in its rulings, and in its instructions to the jury based upon such ruling.

2. The other error complained of which we think it is necessary to look into is, that the court erred in permitting the child, Joe Warrington, six years and eleven months of age, to be sworn and testify for the territory and against the defendant. Joe Warrington was the child upon whom the assault was committed. The rule of common law in regard to the admissibility of children under the age of fourteen years as witnesses was made to depend upon their understanding, and upon their knowledge of the nature of an oath and the consequences of falsehood; and whenever it could be discovered by a court that the child had sufficient understanding of the nature of an oath, and the consequences of falsehood, he was permitted to be sworn and examined as a witness. In the case of *Commonwealth* v. *Hutchinson*, 10 Mass. 225, it was said to be the settled law at that time (1813): "If an infant appear, upon an examination by the court, to possess sufficient sense of the wickedness and danger of false swearing, he may be sworn, although of ever so tender an age. The credit of the witness is to be judged by the jury from the manner of his testimony and other circumstances." There is no precise age at which children are competent or incompetent. Children under the age of fourteen years will not be presumed to have sufficient understanding to be a witness, but investigation may disclose entire qualification. *Draper* v. *Draper*, 68 Ill. 17. "A child produced as a witness, who understands that he is brought into court to tell the truth, and that it is wrong to tell a lie, has sufficient understanding of an oath to be competent." *State* v. *Levy*, 23 Minn. 104, 23 Am. Rep. 678. "It is the duty of the presiding judge to examine the child, without interference of counsel, in regard to the obligation of an oath, and in the

proper cases to explain the same to one intelligent enough to comprehend what he says, and then to determine whether or not such child shall be sworn and permitted to testify.'' *Carter* v. *State*, 63 Ala. 52, 35 Am. Rep. 4.

Such examination was made, or partially made, by the trial judge in this case. It appears from the record that the offense for which the child was punished was for taking a piece of a stove and not returning it, and denying having taken it. Whether he took it in childish play, and forgot where it was left, or whether he took it willfully, and then lied about it, is not plain from the record. The trial judge, in his examination of the child before permitting him to be sworn, had with him the following dialogue: *"The Court.*— I am going to satisfy myself about it. Q. Is your name Joe or Josie?—A. Yes, sir.—Q. Where have you been living? Where did you live before you came here?—A. Before I got to come here?—Q. Yes; before you came up to town?—A. Down on the river.—Q. At whose house?—A. My grandpa's.—Q. Where did you live before that?—A. Up at the Huachuca.—Q. Whereabouts?—A. Huachuca.—Q. At brother Sam's place?—A. Who is brother Sam?—Q. That man over there [pointing to defendant].—A. What one? —Q. That man with black whiskers.—A. Yes, sir.—Q. You know him?—A. Yes, sir.—Q. How long have you known him?—A. For a year.—Q. Did you know him over in Huachuca?—A. Yes, sir.—Q. Well, now, do you know, if you tell a story, that it would not be right for you to tell a story? You know that, don't you?—A. Yes, sir.—Q. You know you ought to tell the truth, don't you?—A. Yes, sir.—Q. Now, you are going to state something here this morning. Do you understand that you are to tell the truth?—A. Yes, sir. —Q. And tell nothing but what you know yourself? Can you do that?—A. Yes, sir.—Q. Do you understand?—A Yes, sir. *The Court.*—I am going to listen to this child's testimony.'' The child was then examined as a witness, and in his examination told very contradictory stories about the affair of the taking of the part of the stove, to wit: Cross-examination: '' . . . Mr. Donnelley claimed you had taken a part of the stove, did n't he, away?—A. Yes, sir.—Q. And you said you did n't take it?—A. Yes, sir.—Q. And he said that you did, and you said that you did n't, and that was what you were

quarreling about, was n't it?—A. Yes, sir.—Q. Do you say you were telling the truth when you said that you did n't take the part of the stove?—A. Yes, sir.—Q. Did n't you take the stove?—A. I took a part of it.—Q. And you took a part of the stove, and carried that part away, and buried it? —A. I did n't bury it.—Q. What did you do with it? Did you take it out and hide it?—A. No, sir; I took it in the bushes.—Q. You dropped it in the bushes?—A. Yes, sir.—Q. You told Mr. Donnelley you did n't take this piece of the stove, and he said you did?—A. Yes, sir.—Q. And that is what he ducked you in the pond for?—A. Yes, sir.—Q. Now, afterwards you went off, and got this piece of a stove, and brought it back to him, did n't you?—A. Yes, sir.'' From which questions and answers it appears that Donnelley charged the boy with taking it, that he denied it, and said that he told the truth when he denied taking it, and that he did not take it, and then confessed that he did take it, and that he put it in the bushes, and, after he was ducked, he went and got it and brought it back. He does not reveal in his examination very much knowledge of the nature of an oath or the consequences of falsehood, except that he answered that people that told a lie would go to jail.

In the case of *Hughes* v. *Railway Co.*, 65 Mich. 10, 31 N. W. 605, a witness of about the same age made no more satisfactory answers to the questions put to him in regard to his knowledge of the nature of an oath and the consequences of falsehood than did this child, yet, as a witness, told quite a straight and consistent story as to how the accident happened in which he was injured, and the supreme court in that case thought that the trial judge had wrongly permitted the child to be a witness, and held that to permit him to testify was error. When we take into consideration that the testimony of this witness tended strongly to corroborate the testimony of the mother as to the extent of the ducking and whipping, and that he admitted that he was and had been under the instructions of his mother in regard to being a witness in the case, and the further fact that it is admitted that there was a great deal of feeling existing at the time of the trial against the defendant, it appears to the court that the trial judge should not have permitted the child to have been sworn and testify. Without noticing further errors

complained of, it is the judgment of this court that the judgment of the district court be reversed, and the cause be remanded to the same court for a new trial.

Davis, J., and Doan, J., concur.

SLOAN, J.—I concur in the opinion upon the first ground, but dissent from the conclusions reached upon the second assignment of error considered.