168 So. 149

### PRUITT v. STATE.

8 Div. 692.

Supreme Court of Alabama.

April 23, 1936.

Rehearing Denied May 28, 1936.

Wm. Stell and H. H. Hamilton, both of Russellville, for appellant.

A. A. Carmichael, Atty. Gen., and Wm. H. Loeb, Asst. Atty. Gen., for the State.

THOMAS, Justice.

The defendant was indicted, tried, and convicted of murder in the first degree and his punishment fixed at death by electrocution.

The defendant was represented by counsel who file a brief for him in this court. No question is presented as to the arraignment, venire, and the three assignments of error urged by counsel have been duly considered.

The witness Pierce testifying as to the bullet holes in the car detailed the facts; as that the hole on the inside of the car was smaller than the hole on the outside and was more jagged on the outside. In this there was no error. Roan v. State, 225 Ala. 428, 143 So. 454; Clemons v. State, 167 Ala. 20, 52 So. 467. There was no error in allowing that witness to further testify that he placed a pencil in the bullet hole to see the direction it entered the car and that the range of the bullet seemed going on the level of the corner, according to the way the hole was through the car.

There was no error in allowing the undertaker and the physician who examined the body to testify as to the manner

and result of such examination, the nature and condition of the wounds, and the range of the bullet in the body. In the foregoing rulings, the action of the trial court was within the rule that obtains and which was recently applied in Alabama Power Company v. Jackson, Adm'x (Ala.Sup.) 166 So. 692,[1] and Rowe v. Alabama Power Company (Ala.Sup.) 167 So. 324.[2] It is established that in homicide cases a description of the locus in quo is relevant as tending to prove the circumstances of the homicide. Reynolds v. State, 24 Ala.App. 249, 134 So. 815, certiorari denied 223 Ala. 130, 134 So. 817.

■ Dr. Reid, who qualified as a physician experienced in such matters, was permitted to state, as to the wounds—knife and gunshot—he found on the body of the deceased, that, in his judgment, the deeper one that "went into the hollow of the abdominal cavity" was a knife wound "calculated to produce death." The witness, testifying as to his qualifications to give an opinion as an expert, said:

"I am an expert on wounds produced by firearms and knives. It is my judgment as an expert the person or persons who fired the fatal wound that entered the heart was within six inches at the time the fatal shot was fired. In my opinion the knife wounds were produced by someone who reached around to his right and came over like this, reaching under like this, and it is my judgment that it would be possible for the wound to have been produced by a person sitting by his side with handcuffs on his arms. It ranged up."

The action of the trial court in admitting the evidence to which exception was reserved was without error.

■ The witness Osborne was allowed to testify that a man who looked like defendant Pruitt came into his store about the middle of the afternoon and asked if he had any guns, and witness asked him "what kind of guns and he said shotguns," and being answered in the negative defendant "turned and walked out." In this there was no error. The corpus delicti being shown, it was in close proximity to the time and place of the homicide and a relevant fact for the jury. Gross v. State, 231 Ala. 529, 165 So. 840.

■ There was no error in allowing the witness Cora Mae Brooks to testify that

about 4 o'clock the deceased arrested the defendant, handcuffed him, and took him to the car; that "I didn't hear anything that Pruitt said to Sanderson as he was taking him to the car. Before Sanderson carried Pruitt off I heard Pruitt tell Sanderson what he would do to him. Mr. Sanderson told him he was going to take him to Russellville and Pruitt, who called himself Jaggers, said, and before you take me to Russellville I will take you and your car both to hell. They went off and turned around down there. I went in the house. Sanderson and Pruitt, when they left mother's home, went toward Red Bay. They drove toward Red Bay a short distance and came back. The woman, Zula, and the little girl got in the car with them. Pruitt sit in the front seat with Sanderson and the woman in the back seat. I did not see Pruitt any more that day. The woman that I am talking about, she said her name was Zula Jaggers and was his wife. She said that in the presence of Pruitt."

■ In the further examination of that witness, the record recites:

"The little deaf girl was there at our house. Zula and the little girl came back in about thirty-five or forty minutes. Zula had blood on her when she came back, I think that she had about as much blood on her when she left in the car with the men; wasn't much worse when she came back than it was before.

"Thereupon, the Solicitor asked the witness the following question:

" 'When she came back which you have stated was within about 35 or 40 minutes after she had left in the car with Sanderson and Pruitt, did she have any blood on her?' Defendant objected to the question and the court overruled the objection and the defendant then and there duly excepted in the presence of the jury. The witness answered: 'She didn't have any more blood on her when she was at our house the last time than she did the first time she was there.' Thereupon, the defendant moved the court to exclude the answer and assigns all grounds assigned to the question. The court overruled the motion and the defendant then and there in open court excepted. Thereupon, the witness continued her testimony as follows:

" 'When she came back the second time she had blood on her hands and she washed them off.

"Thereupon, defendant moved the court to exclude what the witness has said about what was on her hands prior to the time she left with Sanderson as being illegal and foreign to any issue in this case and no part of the res gestae and the court sustained the motion."

The foregoing testimony showing the condition of Zula when she returned was for the jury, as tending to shed light upon the homicide committed about that time and place, and to show her participation in or a party to the commission of that crime.

The witness, Mrs. Diralye Brooks, testified as follows:

" * * when Mr. Sanderson said he was going to take him back with him, Mr. Pruitt spoke up and said: 'No, you may not, I may take you and your car both into hell before you get through with me.' I was standing in the big road in front of my door when he made that statement. Pruitt had the handcuffs on at that time. Mr. Sanderson had his pistol in his pocket and took it out; he put it in his shirt right here (indicating) in his bosom. I don't remember whether he had a cartridge belt on or not. * * I was there during the time Walter Sanderson was arresting the defendant standing by the Cochran woman, and I saw her pick up a knife. The knife was thrown from somewhere or another the first I knowed about it it went through between my feet and hit my dress hem and that made me look and so she just picked it up and laid it on her arm like this and put her pocket-book over it and she said she had bought it to kill a man. That was Zula that said that. It was open and she went off with it that way; you see whenever he threw it it just went between my feet and hit my dress hem. The two women folks was standing there and the two men were in Sanderson's car. Zula got out and got a bible the little girl wanted. She had the knife under her coat sleeve like that, one (of) them old brown rain-coats and she kinda put it down under the cuffs like this and just laid her pocket-book over it like that (Indicating right hand) and she just laid the pocket-book over the knife like that. That is the knife. She got in the car with the knife open and left that way. The little deaf and dumb girl got in the car too. The woman sat behind Mr. Sanderson, Zula Johnson or Jaggers or whatever you want to call her she set behind Mr. Sanderson and the little deaf girl was sitting behind her father, George Pruitt. Mr. Sanderson was driving and George Pruitt was in the seat with him with the handcuffs on. They went towards Rea Bay from my house, and that is the last time I ever seen Mr. Sanderson, and then in just a little while though the woman come back to my house from the direction Mr. Sanderson's body was found. They came back in about thirty-five or forty minutes, maybe a little longer. Mr. Sanderson was found somewhere near two miles from my house."

The witness Robert Upton, Jr., who was in the searching party for the knife and handcuffs, found the knife with something on it that looked like blood, about one hundred yards beyond the woods where the Sanderson car was wrecked; turned the knife over to Mr. Sparks, a deputy sheriff, who identified the weapon in its unchanged condition.

■ The state introduced in evidence, Mr. C. E. Jones, who testified that he was in charge of the School for the Deaf and Dumb at Talladega; has been connected with that institution for twelve years and is familiar with the signs made by the deaf-mutes with their hands; did not teach Tula Pruitt, but had talked with her; that she had attended that school for several years and was able to discern what witness was talking about to her with reference to the case, and while her mind is bright, her ability to talk is not skillful in the sign language. The defendant objected to the question, "Has she talked to you and told you how the killing happened?" propounded by the solicitor to witness, and the court ruled: "He will be sworn as an interpreter and they will pass on his evidence like they would that of any other witness in the case." Defendant excepted, and the witness continued: "I can understand satisfactorily anything she says about the case."

On cross-examination by defendant, the witness Jones said that Tula "has the mind of a six year old child in education"; that he was with her "all yesterday afternoon and this morning in court," and, "It is not * * hard to form an intelligent opinion so as to interpret just what they are trying to say and just what they say"; that he can substantially interpret what she wants to convey to" him; that "it is humanly possible to be mistaken," and he "would not think that after all

\* \* \* what she would convey to" him and he "would convey to the jury might not be right," adding: "I don't know whether it would be right or not."

With this preliminary proof as to the interpreter, the court permitted the deaf-mute, Tula Pruitt, to be called as a witness. The defendant objected to Jones interpreting for Tula Pruitt on the ground that the child did not know the sanctity of an oath, and exception was reserved to the adverse ruling of the court. After Mr. Jones was sworn as an interpreter, the examination of the witness proceeded as follows:

"Q. Now ask her if she knows about God? A. She points up to the sky.

"Interpreter to witness Tula Pruitt: Who is G-O-D? Who is God?

"Answer of Interpreter: She points up to the sky; she knows who God is, yes.

"Ask her if she knows what becomes of little girls who tell the truth?

"What happens to little girls who tell the truth? A. She says 'They are good, very good.'

"Q. Ask her if she knows what it is to tell the truth? A. She says, 'Yes, I will tell the truth.'

"Q. Ask her what becomes of little girls who tell the truth? A. She says, 'They are good, very good.'

"Q. Ask her if she knows where Hell is? A. She says 'I don't know.'

"Q. Ask her if she knows what becomes of good little girls who do tell the truth, when they die? A. She says 'Yes.'

"Q. Ask her who her father is? A. She says 'This man (indicating the defendant) is her father.'

"Q. Ask her who Zula is? A. She says 'I don't see Zula.' She says: 'Zula is in jail.'

"Q. Ask her to tell you what happened when Mr. Walter Sanderson was killed?

"The defendant objects to the witness testifying and to each and every part thereof, to each and every question heretofore asked and moves the court to exclude the answers thereto and objects separately and severally to each and every question and answer thereto on the ground it affirmatively appears and is most affirmatively shown that she does not know what Hell is and would not know the solemnity of an oath.

"Q. Ask her if she knows what becomes of good little girls, and if she knows what death is? Q. Ask her what death is, and what becomes of little girls who tell the truth, after they die? A. She says 'They go to heaven.'

"Q. Ask her about bad little girls who don't tell the truth, what happens to them when they die? A. She says 'Good little girls go to above' she points upward.

"Q. Ask her about bad little girls, what becomes of them? A. She said 'I do not know'.

"Q. Ask her if she knows what it is to pray? A. She says 'Yes'.

"Q. Ask her to whom do you pray to? A. She says she prays to God.

"Q. Ask her if she knows who the Bad Man is? A. She says 'I do not know'.

"Q. Ask her who the Bad Man is? What is sin? A. She says 'I do not know'. She says she does not know; we emphasize in their training Heaven, but we do not talk about Hell to them: We teach them what Heaven, Love and God is. That is where we put our emphasis on their training.

"Q. Ask her who the Bad Man is? A. She says doesn't know.

"The defendant objects to her testimony again on the grounds last assigned and that she would not know the solemnity of an oath and her testimony would not be admissible.

"By the Interpreter: In school we teach them about God, but we do not impress on their minds about the other place.

"Defendant further objects on all grounds heretofore assigned and that the testimony shows that the little girl Tula is a Moron and her testimony would not be admissible in this case. Objection overruled by the court. The defendant duly excepts to the ruling of the court.

"Q. Ask her to tell you how the man, Mr. Sanderson, was killed? A. She says 'Z-u-l-a'.

"Defendant wants it understood that they have an objection to each and every question on the grounds heretofore assigned. Objection overruled, defendant excepts."

Much stress is laid on the answer of the witness to the question where she would go after death if she failed to do right or testified untruthfully, and the question where hell was, the answer to the latter being, "I do not know." When the whole

of her qualifying answers is considered, we cannot say the trial court abused its sound discretion in admitting the evidence of Tula Pruitt through the interpreter.

In the notes to McGuff v. State, 88 Ala. 147, 7 So. 35, 16 Am.St.Rep. 25, 31, the authorities are collected to the effect that, "A boy of twelve years, with the ordinary intelligence of boys of his age, understanding the obligation of an oath, is not rendered incompetent because he could not speak English: State v. Severson, 78 Iowa, 653, 43 N.W. 533. There is no precise age under which a child is deemed incompetent as a witness, but, under fourteen years of age, competency is within the discretion of the trial court, and is to be determined by an examination of the child: Hawkins v. State, 27 Tex.App. 273, 11 S.W. 409; Hughes v. Detroit, etc., Ry. Co., 65 Mich. 10, 11, 31 N.W. 603. One may be competent as a witness at a second trial, though upon the first trial of the same case she was decided incompetent by reason of her tender years: Johnson v. State, 76 Ga. 76."

In the case of Moore v. State of Georgia, 79 Ga. 498, 502, 503, 5 S.E. 51, 52, the Supreme Court of Georgia made the following observation as to such answers:

"For children to be competent as witnesses it is not requisite that they should profess to know what becomes of any one who swears to a falsehood, or the effects of an oath. If they know their own ignorance touching these great mysteries and candidly avow it, there is the more reason to think they have some clear knowledge on other subjects and will be candid in communicating it. It is enough for mere competency if they know the nature of an oath."

And to the same effect is Berry v. State, 9 Ga.App. 868, 72 S.E. 433, 434.

In White v. State, 136 Ala. 58, 66, 67, 34 So. 177, 180, observation of the rule here pertinent is made as follows:

"As was said in McKelton v. State, 88 Ala. 181, 7 So. 38: 'The rule is that persons who have no comprehension of the nature and obligation of an oath, and are incapable of appreciating their responsibility for its violation, should not be admitted as witnesses; and this without regard to the cause from which the defect has arisen, and hence without reference to the age of the witness.' While recognizing the rule that, in passing upon the capacity of children of tender years to testify, much must be left to the sound discretion of the trial court, and that it is only in strong cases the ruling of the court admitting them as witnesses should be reversed."

And in Crenshaw v. State, 205 Ala. 256, 258, 87 So. 328, 329, it was said:

"In passing initially upon the competency of children as witnesses, much must be left to the sound legal discretion of the trial court, and 'it is only in strong cases the ruling of the court admitting them as witnesses should be reversed.' White v. State, 136 Ala. 58, 66, 34 So. 177, 180; Beason v. State, 72 Ala. 191, 194; Castleberry v. State, 135 Ala. 24, 28, 33 So. 431; McGuff v. State, 88 Ala. 147, 150, 151, 7 So. 35, 16 Am.St.Rep. 25, where a forceful statement of the wisdom and necessity of taking the testimony of children of tender years, competent as witnesses may be found."

In the case of Birmingham Railway, L. & P. Co. v. Jung, 161 Ala. 461, 478, 479, 49 So. 434, 440, 18 Ann.Cas. 557, it was declared:

"'An oath is a solemn adjuration to God to punish the affiant if he swears falsely. The sanction of the oath is a belief that the Supreme Being will punish falsehood; and whether that punishment is administered by remorse or conscience, or in any other mode in this world, or is reserved for the future state of being, cannot affect the question, as the sum of the matter is a belief that God is the avenger of falsehood.' See Beeson v. Moore, 132 Ala. 391, 31 So. 456. The competency of a person to take the prescribed oath, to become a witness, is, of course, a question for the court; and upon the objector to competency rests the burden to sustain it. Green Ev. §§ 369, 370. The examinations, voir dire, of witnesses, were elaborate; counsel for both sides and the court propounding many questions. * * * We must be content with this statement and ruling, based upon a careful consideration of the record in this regard: That while these persons evinced, in some particulars, crude and perhaps absurd ideas with respect to their belief of the source of the Godhead, they gave, in general, unmistakable evidence of a belief in the existence of the Godhead and that God was the 'avenger of falsehood.'"

To like effect is Puckett v. State, 213 Ala. 383, 105 So. 211.

We think the examination made in the trial court demonstrated that no abuse of judicial discretion was committed by the trial court in admitting Tula Pruitt as a witness and in permitting her evidence to be given through the interpreter Jones.

The bill of exceptions recites that the defendant called Lucille Knight as an interpreter, who, after being duly sworn, interpreted the witness Tula Pruitt as follows:

"She says that she stated to me and my sister-in-law at the jail this morning that Zula did the shooting and cutting both. Thereupon, the following occurred:

"Q. Ask her (Tula Pruitt) if she didn't, over here this morning when she talked to you and her father, if she didn't say that 'Zula did it all?' A. She is talking about the dead man.

"By Mr. Simpson: Mr. Jones how do you interpret what she is saying now? What she just said? A. She says: 'Father stole horse.'

"That her father stole a horse? A. Yes sir.

"Cross-examination (Mrs. Knight) by Mr. Simpson, Jr.:

"Q. Ask her who did the shooting? A. She said 'Zula'.

"Q. Ask her if George shot him?

"By Mrs. Knight: Did Zula or father shoot him?

"Q. Did she say 'Father'? A. She does that for Zula.

"The defendant now renews objection to the witness' testimony and moves the court to exclude all the evidence because the witness is not qualified because in one instance the witness says her father did it all and the next instance Zula did it all.

"By the Court: That's a question for the jury. I think some of the statements made that she shows to be qualified as a witness and as to the credibility to be attached to her testimony that's a question for the jury and not for the court. Defendant excepts."

The foregoing interpretation being somewhat at variance from that theretofore made by Tula through the interpreter Jones, as a state witness, the latter was recalled and examined by the solicitor, as follows:

"For the purpose of refreshing her recollection ask her if she did not state in the witness room there that Zula did the cutting and father did the shooting?

"The defendant objects (on the ground that it was) illegal, irrelevant, immaterial and incompetent, because it was not in the presence of the Solicitor and the Interpreter could not cross-examine her and it is improper because the witness or rather this gentleman was not present and because this is an interpreter supplied by the State and not by the defendant and on the further ground that the State can not cross-examine their own witness. Objection overruled and the defendant excepts.

"A. Yes that is true.

"Q. What was her answer? A. I asked the girl if in the room she said Zula cut the policeman and father shot him and she said: 'Yes, that's the truth'.

"Defendant now moves the court to exclude the answer. Motion overruled and the defendant excepts."

This was but to refresh the recollection of the witness under great disability, and was permissible as the only possible means of cross-examination of the witness, standing, as she did, in a peculiar attitude to the case, the state and the defendant. Corroboration of the witness by her former statement made out of court is not denied by the general rule (Shamberger v. State, 221 Ala. 538, 130 So. 70) being within its exception.

In Nichols v. Stewart, 20 Ala. 358, 360, dealing with exceptions to the general rule, Mr. Justice Goldthwaite said:

"It is certainly true that admissions of this character, are sometimes received for the purpose of sustaining and corroborating the evidence of a witness who stands before the court in a suspicious attitude; as where he is a near connexion of the party whose interest is advanced by his testimony, if he is shown by unquestionable evidence, to have given the same account of the transaction, before the connexion, according to the ordinary course of things, could have been contemplated; the imputation, in that case, resulting solely from the position occupied by the witness, is entirely removed. So also upon accusations of rape, and perhaps some other crimes, where the mere silence of the witness might operate to cast suspicion on the facts subsequently sworn to, it is proper to prove the statement of the witness, made in consistency with the facts sworn to by him on the trial. In this

case the declarations of the witness become acts, and the rule simply allows the suspicion, which might be created by the fact of silence, to be repelled by contrary proof. 1 P.Ev. 307."

See, also, Long v. Whit, 197 Ala. 271, 72 So. 529; Brooks v. State, 185 Ala. 1, 64 So. 295; McKelton v. State, 86 Ala. 594, 6 So. 301.

The course of cross-examination of such a witness through another interpreter was the only proper means of obtaining the truth, or what the witness intended and did testify. If this be held to be an exception to the general rule, that "a witness can not corroborate his testimony by proving that he made statements to others similar to those testified to by him" (James et al. v. State, 115 Ala. 83, 22 So. 565; Green v. State, 96 Ala. 29, 11 So. 478), it grows out of the necessity of the case.

At this point it should be borne in mind that interpreters are sworn as other witnesses; that they are distinguished from the witness whose evidence they interpret, when the other's language is different from that commonly used by the court, or of a witness who cannot speak. Birmingham Railway, L. & P. Co. v. Jung, 161 Ala. 461, 49 So. 434, 18 Ann.Cas. 557; Amory v. Fellowes, Executor, 5 Mass. 219. And it must follow that interpreters are subject to contradiction and impeachment, as other witnesses.

The method employed in the instant case was necessary, recognized, or existed in the introduction of the best evidence possible, arising as it did out of the witness' peculiar physical condition and attitude to the parties at interest, her inability to speak only through her several interpreters, and their relations and interest or bias or the absence thereof to the defendant. 1 Wharton's Law of Evidence, § 570, p. 517; 70 C.J. p. 1148, § 1335, p. 1169, § 1353. And evidence which directly tends to disprove the testimony of a witness (here, the interpreter) is admissible in contradiction of that given. Clifton v. Gay, 21 Ala.App. 412, 109 So. 168, certiorari denied 215 Ala. 22, 109 So. 170; Barnett v. State, 83 Ala. 40, 3 So. 612.

The defendant testified that about the year 1929 he was "convicted of the violation of the Dyer Act in the United States District Court for stealing a car, and sentenced to three years' imprisonment in Chillicothe, Ohio Federal Penitentiary";

that he "went up to Atlanta, Georgia, on the same charge"; and upon further interrogation by the solicitor answered, "I stated that I was in Atlanta in prison." There was no error in declining to allow defendant's attorney to ask: "And I believe they put you into the insane ward at that time, didn't they?" and "At the time he, Mr. Simpson asked you about being in Atlanta at the same time he inquired about were you in the insane ward of the prison?" These questions were not within the rule of bringing out a part of the transaction and the right to prove the whole facts or conversation. Higdon v. State, 25 Ala.App. 209, 143 So. 213.

The witness Langdon testified of the arrest of the defendant in Tennessee, and that no inducements or threats were held out to defendant; that he voluntarily made statements and confessed after being warned. The court excluded that part of the witness' testimony with reference to the crime of mule-stealing, as it was not of the class of prejudicial error, the effect of which could not be eradicated. In the admission of the witness, other statements of the conversation of and with the defendant that led to the confession were, that he was "a bad man * * * wanted more than one place," an "escaped convict from the Parkman farm in the State of Mississippi and * * * wanted in the State of Alabama." The court excluded what the defendant "said about other offenses other than this one is not relevant." Thereupon, the defendant moved for "a mistrial * * * on account of the statement of the witness that the defendant was an escaped convict from Mississippi." The statement so excluded was a part of the confession that followed immediately, viz.: "I am wanted by the State of Alabama. They have out a five hundred dollar reward for my arrest. I killed the Sheriff of Franklin County on the tenth day of April." Witness testified further as follows:

"I had not heard about that and after he made the remark, I said we'll check it. He said all right go to the telephone. I did, called up in his presence. However, I did not call the sheriff because I thought the sheriff was dead. I called the sheriff's office and asked if the sheriff had been killed and I learned of this case. That was in the presence of the defendant. I repeated to the sheriff what I had learned and after I had the conversation with the sheriff I repeated what they told me. I told him his story seemed to be checking out pretty well;

that he must be telling the truth, and the description given to me fitted his, with the exception of the hair and he had already told me that he had dyed his hair. He said he dyed his hair at Memphis, Tennessee. He told me that his wife was in the Franklin County jail and that his name was Brittharte. He said he shot the sheriff of Franklin County. He said the man he killed, in that same conversation, had arrested him on a drunken charge," giving the details of that arrest.

The qualification of this witness and the ascertainment of the whole conversation that entered into and was a part of the confession was for the court, and showed the admissions were voluntary. The court's ruling and exclusion of what was said of other offenses were sufficient, and admonished the jury that the fact that defendant was wanted for other offenses was not to be considered against him in this case. The witness' statement of defendant's conversation or admissions to him, that his wife was in the Franklin county jail and he had a good mind to get his rifle and get hold of that jailer up there and take her away; what defendant said of his clothing, rifle, and machine gun, and witness carrying him in search thereof, was competent and relevant testimony.

 The witness Busby's testimony as to the search for and the finding of the handcuffs and the location thereof as related to the place where the car collided with the tree and was wrecked was likewise relevant corroborative evidence.

 The defendant, availing himself of the right to testify, waived his constitutional protection, and was subject to be impeached in the same manner as other witnesses. Gast v. State (Ala.Sup.) 167 So. 554; [3] Carpenter v. State, 193 Ala. 51, 69 So. 531; Carter v. State, 226 Ala. 96, 145 So. 814; State v. Scott, 332 Mo. 255, 58 S.W. (2d) 275, 90 A.L.R. 870.

 The court stated to defendant's counsel that he was now given the opportunity to put the witnesses on the stand and examine them as to the mental condition of Tula Pruitt, the deaf-mute, if they so desired. Thereupon, Lucille Knight (who had theretofore acted as interpreter for defendant) was recalled and testified that she has known and been associated with Tula all her life; knew her mental condition and would not believe her on oath; that "she

is easily persuaded to make a statement * * * you can get her to say most anything you want her to say." This was introduced in evidence by the defendant without objection of the state's counsel, who thereupon asked, over defendant's objection:

"Did you know that she had made the same statement about this case to ten or fifteen different people and had never changed it until you came into the Court room on yesterday?"

Witness answered:

"I didn't. No sir, I didn't know it. * * * I didn't go over to the jail yesterday before the trial and carry her away and talk to her; she saw me in the window and showed me where Zula stayed. She told me that Zula did the cutting and shooting before we walked around, and she was seated down there in front of the jail when she told me that.

"Thereupon, the Solicitor asked the witness the following question:

"You heard this child in the witness room on yesterday when she told me, you, and the Interpreter from Talladega Institution that Zula did the cutting and George did the shooting, didn't you?

"The defendant objected illegal, irrelevant, immaterial and incompetent and not in the presence of the defendant; the Court overruled the objection and the defendant in open Court and in the presence of the jury excepted, and the witness answered:

"Yes sir and you heard her tell me out here—you answer my questions your attorney is amply able to argue the case.

"Answer, Yes sir I heard her say that.

"Thereupon, the witness continued her testimony as follows:

"She will be fourteen years of age the 12th day of October. She is smart and I regard her as being a smart child."

In these rulings of the trial court there was no error. The witness had acted as interpreter for the defendant, and in the respects indicated her version of what the witness Tula Pruitt said as to the material fact in question—who shot deceased—was different from that detailed by Mr. Jones as being Tula's statement of fact by the interpreter for the state. It was a method of cross-examination permissible as affecting the interpreter and her interpretation of the witness under the peculiar attitude of the

witness Tula Pruitt to the case and growing out of her infirmity.

The defendant further examined, without objection, Sidney Pruitt, Henry Pruitt, and Minnie Pruitt as to the mental status of Tula Pruitt. They testified that she was thirteen or fourteen years of age; had the mind of a child of tender age or "did not think her mind was good"; that "she talks different ways but by signs more than any other"; that she makes contradictory statements of a fact detailed at different times, and could not be trusted to do things as she was told.

In reply to this tendency of the evidence, the state introduced the witnesses Berry Shedd and C. E. Jones, who gave evidence tending to rebut the foregoing. The witness Shedd was asked and answered as follows:

"Does she appear to you to make one statement about a thing at one time, and another statement and different statement about the same thing at another time? * * *

"No, sir, not when she understands what I ask her, if I can make her understand she answers the same. * * *

"Did she ever make any—in talking about the case here, did she ever at any time make any contradictory statements to you about how it happened? * * *

"She has always told us the same thing every time she has told us about it."

Thereupon the witness continued his testimony without objection:

"She might have added a little to it that she had overlooked before, but she had never changed it as to the way it happened. From my observation of the child I do not regard her as being of low mentality. She has told it the same way more than twice, at least a dozen times just alike, except about some minor details that probably had been overlooked."

In this action of the court there is no reversible error.

We have indicated this is an exceptional case where the deaf-mute, Tula Pruitt, testified to the jury through an interpreter for the state and a different interpreter for the defendant. It was the means employed at the trial to adduce her version of the homicide—to adduce the best evidence that may be obtained under the unusual and difficult circumstances that entered into the case—and was necessary for her to give her version of the homicide in the sign language of deaf-mutes. It was for the jury to decide what her true statements were, and to what weight and credibility they were entitled. She was the afflicted daughter of the defendant and the only eyewitness aside from defendant, his wife, and codefendant. It was therefore important, material, and necessary to thus cross-examine her and her several interpretations; as was done as to the witness Shedd within the exception to the general rule. Nichols v. Stewart, 20 Ala. 358.

The evidence tending to show flight of the defendant after the crime was competent. Goforth v. State, 183 Ala. 66, 63 So. 8.

The defendant moved to exclude from the jury the remark of the solicitor that "Dillinger killed most of the people he killed when he was an escaped convict," and the court promptly sustained the motion. This action of the court was proper; the remark and its injurious effect upon the jury was of the class held eradicable. Peterson v. State (Ala.Sup.) 166 So. 20, 23.[4] This was not within the rule of Moulton v. State, 199 Ala. 411, 74 So. 454; Birmingham Electric Co. v. Bryan, 25 Ala.App. 556, 150 So. 560.

Defendant's charge 21 was properly refused for employing the expression "if you believe." However, when the oral charge of the court is considered, the trial court charged the jury on conspiracy. There was evidence showing that when the defendant was arrested and immediately before the party entered the automobile of the deceased officer, defendant threw a knife to Zula Cochran and, she picked it up and concealed it on her person and so entered the car; that a short while thereafter she cut the deceased officer having defendant under arrest, and in the altercation that followed the officer's pistol was taken from him and he was killed therewith by the defendant or his wife. The charge was argumentative (Bohlman v. State, 135 Ala. 45, 50, 33 So. 44), confusing, and misleading in the use of the words "having no connection with the common object for which they were together * * * on the day the killing is said to have been done." Non constat they might

---

[4] 231 Ala. 625.

have formed a conspiracy to take the life of the deceased and which was no part of any "common object for which they were together." Moreover, we have indicated the charge was properly refused for employing the expression "if you believe." We have held the trial court would not be reversed for the refusal of such a charge.

The date fixed for the execution of the sentence of the law having passed, pending this appeal, it is ordered and adjudged that Friday, the 12th day of June, 1936, be and the same is fixed as the date upon which the sentence will be executed as provided by law.

Affirmed.

All the Justices concur.

