STATE OF NEBRASKA, APPELLEE, V. MICHAEL LAFRENIERE, APPELLANT.
481 N.W.2d 412

Filed March 13, 1992.    No. S-91-690.

Gerard A. Piccolo, Hall County Public Defender, for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Pursuant to verdict, the defendant-appellant, Michael LaFreniere, was adjudged guilty of theft by receiving stolen property, in violation of Neb. Rev. Stat. § 28-517 (Reissue 1989). He assigns but one error, the district court's determination that the evidence is sufficient to support the conviction. The record sustains the assignment, and we thus reverse and remand with direction that the information be dismissed.

The charge stems from the State's claim that on October 17,

1990, LaFreniere sold approximately 720 pounds of uninsulated copper wire, owned by Union Pacific Railroad, with the knowledge or belief that it was stolen.

At the time of the incident, the 40-year-old LaFreniere was employed by the city of Kearney at its "tree burning dump." While the dump was designed to be used for trees, pallets, and grass, the record demonstrates that other items are quite often discarded there. LaFreniere was responsible for collecting dumping fees when the dump was open for general business, between 1 and 5 p.m. As manager of the dump, LaFreniere had first salvage rights to any recoverable items.

Philip Hilty, foreman of the city's sanitation department, testified that the gate to the dump is frequently left open during off hours and that several individuals have keys and come and go as they please.

Darwin Glinsmann, a manager of signal maintenance for the railroad, testified that on the morning of October 14, 1990, he noticed some line wire missing from his employer's poles which run parallel to certain railroad tracks. The following evening, on October 15, 1990, he noticed more line wire missing. Two sizes of copper wire were taken: Nos. 6 and 10.

Kenneth Schleiger, a senior special agent for the railroad, investigated the missing wire. He opined that more than one person was involved in stealing the wire since a total of 53,800 feet was missing. It was also his opinion that the wire was cut into 110-foot sections, equal to the distance between the poles. Schleiger contacted several of the salvage companies in the area and asked that they report to him if any copper wire was brought in for sale.

On October 17, 1990, Schleiger received a telephone call from Kramer Iron and Metal of Grand Island, informing him that some copper wire had been brought in. Schleiger went to Kramer's, where he found two wheelbarrows containing 714 pounds of rolled Nos. 6 and 10 copper wire. Each roll contained several cuts of wire, but Schleiger did not determine their length. Schleiger concluded that the wire belonged to his employer; Kramer's records listed LaFreniere as the seller.

On October 23, 1990, Schleiger went to LaFreniere's house in Kearney armed with two deputy sheriffs who had a search

warrant; Schleiger found what appeared to be a piece of No. 6 copper wire in a burn barrel located in LaFreniere's backyard and a pair of boltcutters located in LaFreniere's pickup truck. LaFreniere readily admitted he had sold copper wire to Kramer's, and gave Schleiger the receipt as proof.

According to Schleiger, LaFreniere said he had found the wire "at the tree dump and seized control of it and sold it." Schleiger further testified that "[LaFreniere] thought [the wire] possibly belonged to some other people but he never would really divulge the name, if he knew their names; but that he saw it, thought that they possibly left it . . . and he seized control because he indicated he had salvage rights at the tree dump." Schleiger commented that when he told LaFreniere that several people must have cut the wire and asked him about his boltcutters, LaFreniere admitted that some of the wire at Kramer's bore the markings of his cutters, since he had to trim some ends to fit the wire into his pickup truck.

Testifying in his own defense, LaFreniere confirmed that he had sold the copper wire to Kramer's. He explained that since it was fall cleanup in Kearney, the gate to the dump had already been opened the morning he found the pile of wire. He testified that he drove to Kramer's in Grand Island instead of going to the local salvage yard he had used on numerous other occasions because he had been asked by an auction house in Kearney to take some television sets to an auction house in Grand Island. According to LaFreniere, he had three console and seven portable television sets in his pickup truck. He also gave uncontroverted testimony that a number of wire users have from time to time left copper wire at the dump for discard and that he had on one other occasion sold approximately 400 pounds of copper wire. Indeed, Hilty, LaFreniere, a contractor, and one of LaFreniere's neighbors all testified that they had seen wire at the dump on numerous occasions. There is further evidence that it was not unusual for LaFreniere to have in his possession wire, tin, aluminum, brass, lead, and other metals found at the dump. Admitted into evidence as well were a series of receipts provided by LaFreniere, showing that he regularly sold wire and metals to local salvage yards.

At the close of all the evidence, LaFreniere's renewal of his

motion for directed verdict was denied by the court.

In order for a defendant to be convicted of receiving stolen property, it must be found that the accused received, retained, or disposed of stolen property knowing or believing that it was stolen. § 28-517. The central focus of the crime, therefore, is on the accused's knowledge or belief.

"The meaning of 'knowingly' in a criminal statute commonly imports a perception of facts required to make up the crime. [Citation omitted.] Knowledge, like intent, may be inferred from the circumstances surrounding the act." *State v. Mills*, 199 Neb. 295, 300, 258 N.W.2d 628, 632 (1977). The U.S. District Court for the District of Nebraska has stated that an "act is done knowingly if it is done voluntarily and intentionally, and not because of mistake or accident or innocent reason." *Casbah, Inc. v. Thone*, 512 F. Supp. 474, 486 (D. Neb. 1980), *aff'd in part and rev'd in part* 651 F.2d 551 (8th Cir. 1981).

Perhaps the clearest explanation of "knowingly" by this court is found in *Hancock v. State ex rel. Real Estate Comm.*, 213 Neb. 807, 331 N.W.2d 526 (1983). Therein, the court was concerned with the meaning of "know" as used in a statute dealing with the conduct of one holding a license to engage in the real estate business. Having concluded that the statute was penal in nature, this court wrote that "[i]n construing a penal statute nothing will be recognized, presumed, or inferred that is not expressed, unless necessarily or unmistakably implied in order to give effect to the statute." 213 Neb. at 811, 331 N.W.2d at 529. In upholding the dismissal of a complaint lodged against a licensee, the *Hancock* court, citing *Pettus v. State*, 200 Miss. 397, 27 So. 2d 536 (1946), stated:

A statute making it a crime to "knowingly" receive stolen goods has been held to require a person to have such information from facts which should convince him that the property was stolen, or which should lead a reasonable man to believe they have been stolen, before, in a legal sense, he knew they were stolen.

213 Neb. at 812, 331 N.W.2d at 530. The *Hancock* court also referred to the Model Penal Code definition of knowledge. " 'When knowledge of the existence of a particular fact is an

element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist.' " 213 Neb. at 812, 331 N.W.2d at 530. The *Hancock* court, for the purpose then under consideration, concluded

> from an examination of these authorities and the statute here involved that a broker or salesperson will be considered to "know" of a prior listing contract if he had actual knowledge of it or if he had actual knowledge of facts that would cause a reasonably prudent person to believe such contract existed.

213 Neb. at 813, 331 N.W.2d at 530.

Finally, Model Penal Code and Commentaries § 2.02, comment 9 at 248 (Official Draft & Revised Comments 1985), provides a broader meaning of "knowledge," identified as " 'wilful blindness.' " Under the willful blindness concept, the actor "is aware of the probable existence of a material fact but does not determine whether it exists or does not exist." *Id*. In other words, the actor has reason to believe or know something is true but refuses to investigate, in order to later deny knowledge and appear ignorant. See *Leary v. United States*, 395 U.S. 6, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969). See, also, *State v. Douglas*, 217 Neb. 199, 280, 349 N.W.2d 870, 911 (1984) (dissent of Shanahan and Grant, JJ., and Moran, D.J., concluding that the accused was willfully blind of certain facts and "thus 'knew' or had 'knowledge' of the" improper financial arrangement).

When these definitions are applied to the instant statute, the State was required to prove LaFreniere guilty under one of three standards: (1) that he had actual knowledge to convince him that the wire was stolen, (2) that he knew of facts which would lead a reasonably prudent person to believe that the wire was stolen, or (3) that he was willfully blind to facts showing the wire was probably stolen.

It should be pointed out that while the record is replete with evidence regarding the theft of the wire from the railroad's poles, LaFreniere was not charged with stealing the wire. Whether intentional or otherwise, the proliferation of this evidence creates an implication that perhaps LaFreniere stole

the wire originally and thereafter disposed of the stolen goods. The State's strategy appeared to be an attempt to indirectly paint LaFreniere as the thief. But as LaFreniere was not charged with the theft of the wire itself, the only evidence relevant to the charge prosecuted is that which relates to LaFreniere's finding, seizing, and selling the wire.

While LaFreniere said he thought the wire "possibly belonged to some other people," he also thought they may have left it at the dump for burning purposes; he seized control of it because he had salvage rights. The belief that the wire may have belonged to someone, standing alone, does not lead to a conclusion that the copper wire was stolen any more or less than it implies that it was discarded. The State failed to show that LaFreniere either knew the owner or knew that the owner did not intend to discard the wire. Neither is there any evidence which demonstrates that a reasonably prudent person would believe the wire was stolen.

It must be borne in mind that according to the uncontroverted evidence, the wire was found at a dump, a place where permanently abandoned items are put. The fact that LaFreniere sold the wire to Kramer's and not to his usual salvage yard is noteworthy but does not, in and of itself, tend to support LaFreniere's guilt.

Circumstantial evidence is sufficient to support a conviction if the evidence and the reasonable inferences which may be drawn from the evidence establish guilt beyond a reasonable doubt. *State v. Jones*, 230 Neb. 968, 434 N.W.2d 333 (1989). However, in determining the sufficiency of circumstantial evidence to support a conviction, "[a]ny fact or circumstance reasonably susceptible of two interpretations must be resolved most favorably to the accused." *State v. Earlywine*, 191 Neb. 533, 535, 215 N.W.2d 895, 896 (1974). Accord *State v. Dawson, ante* p. 89, 480 N.W.2d 700 (1992). Moreover, while the State need not disprove every hypothesis except that of guilt, an accused is presumed to be not guilty and cannot be convicted unless the State has proved the accused guilty beyond a reasonable doubt. Thus, in determining the sufficiency of circumstantial evidence to support a conviction, any fact or circumstance reasonably susceptible of two interpretations

must be resolved most favorably to the accused. *State v. Dawson, supra.*

As a matter of law, the evidence presented fails to establish that LaFreniere had actual knowledge that the wire was stolen, that he knew facts which would lead a reasonably prudent person to believe the wire was stolen, or that he was willfully blind to facts showing the wire was stolen.

Accordingly, the district court erred in determining that the evidence was sufficient to sustain a verdict of guilt and thus erred in failing to sustain LaFreniere's motion for directed verdict. See *State v. Wegener,* 239 Neb. 946, 479 N.W.2d 783 (1992) (directed verdict appropriate where there is a complete failure of evidence to establish essential element of crime charged or evidence so doubtful in character and lacking in probative value that finding of guilt cannot be sustained).

REVERSED AND REMANDED WITH
DIRECTION TO DISMISS.