STATE OF NEBRASKA, APPELLEE, V. JARON DEAN, APPELLANT.

523 N.W.2d 681

Filed November 18, 1994.    No. S-93-929.

Dennis R. Keefe, Lancaster County Public Defender, and Sean J. Brennan for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HASTINGS, C.J., WHITE, CAPORALE, FAHRNBRUCH, LANPHIER, and WRIGHT, JJ., and BOSLAUGH, J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

Following a bench trial, the defendant-appellant, JaRon Dean, was adjudged guilty of second degree murder and the use of a firearm to commit that felony. Inasmuch as he was sentenced to life imprisonment for the murder, his appeal was docketed in this court. See Neb. Rev. Stat. § 24-1106 (Cum. Supp. 1994). He asserts the trial court erred in (1) refusing to apply the doctrine of collateral estoppel, (2) overruling his motion to suppress his statements to the police, (3) receiving certain evidence, (4) failing to affirmatively find the existence of malice, and (5) finding the evidence otherwise sufficient to establish second degree murder. We affirm.

## II. BACKGROUND

On October 22, 1992, Phillip Secret and Deron Haynes were involved in a dispute concerning an automobile accident with Haynes and the sister of Secret's girl friend. When Haynes took a gun from the trunk of his automobile, Secret retreated to his vehicle and left the scene.

Later that evening, Secret met with Dean, Leonard Anderson, Anthony Cates, and Gregory Pool at Anderson's house, where Secret brought out a blue bag containing a 12 gauge shotgun, a .22-caliber revolver, and an AK-47 rifle. Anderson had also brought a gun, a .380-caliber semiautomatic pistol. The group then drove to a trailer where they understood Haynes was living with his brother and another person. Two automobiles were parked near the trailer when the group initially drove by it, at which time lights were on inside the

middle part of the trailer. When the group drove by the trailer a second time, only one automobile remained parked near the trailer, and the lights were still on inside the middle section of the trailer. The group parked their automobile in back of the trailer and distributed the weapons. Cates armed himself with the shotgun, Pool selected the .22-caliber revolver, and Dean took the AK-47 rifle. Anderson kept his own .380-caliber semiautomatic pistol.

While the group approached the trailer, Keith Williams and others arrived. Pool and Dean then walked to the front of the trailer. Cates, Anderson, and Williams remained at the back of the trailer. The four armed men repeatedly shot their weapons into the lighted section of the trailer and then fled the scene.

Police later found Haynes' corpse inside the trailer. The pathologist who conducted the autopsy testified that the death resulted from a single gunshot wound to the chest and that the fatal bullet entered the victim's body on the right side toward the back of his armpit and left a small spherical wound. The exit wound was located on the left side of the victim's back and was slightly larger than the entrance wound, a fact which suggested a high-velocity missile. In the pathologist's opinion, the victim was killed by a small-caliber, high-velocity weapon. Of the weapons used by the gunmen, only the AK-47 rifle could fire such a high-velocity missile.

The firearms and tool mark examiner for the Nebraska State Patrol crime laboratory inserted a dowel into a bullet hole that penetrated both the exterior and interior walls on the west side of the trailer, thus establishing the angle at which the bullet making the hole entered. He then used a laser beam to reconstruct the path the bullet traveled. He placed a tripod where investigators found spent AK-47 rounds near the trailer, attached a laser tube and rifle scope to the tripod, and aligned the beam with the bullet hole. Thus aligned, the laser beam projected through the bullet hole and into the trailer under the right arm of a police officer, the same area in which the bullet entered the victim's body.

After being arraigned and having had an attorney appointed for him and while in custody at the Lincoln Correctional

Center, Dean used the communication system in his single-occupant cell and asked to talk to police Sgt. Gregory H. Sorensen, a longtime acquaintance. The correctional security officer receiving the request notified her supervisor, following which Sorensen was contacted.

At the suppression hearing, Sorensen testified that after learning of Dean's request, he went to the Lincoln Correctional Center and met with him. Notwithstanding that Dean had signed a form waiving his *Miranda* rights when taken into custody, Sorensen presented him with a second such form. The form advised Dean that he had a right to remain silent, that anything he said could and would be used against him in court, that he had a right to an attorney before answering any questions and to have the attorney present during questioning, and that if he could not afford an attorney, one would be appointed before questioning without any cost to him. In addition, Sorensen asked Dean if he understood each of his rights, and Dean said "yes." Sorensen then asked Dean if he was willing to talk with him and, upon receiving an affirmative reply, asked Dean to go ahead and tell Sorensen what he wanted. Dean asked if they could make a deal, and Sorensen replied that he could make no deal, that only the county attorney could do that. Sorensen then asked what possessed Dean to do something like this. Dean replied that he did not know, but wanted to blame drug use. When Sorensen asked why he would shoot into a trailer, Dean again said that he did not know and that he thought he was shooting high enough not to hit anyone. He knew there was someone in the trailer earlier, but thought the trailer was empty at the time of the shooting. Sorensen repeated Dean's statements at trial.

All four gunmen were charged with first degree murder and with the use of a firearm to commit a felony. In a separate trial, Anderson was convicted of aiding and abetting Dean in the commission of second degree murder and using a firearm to commit a felony.

## III. ANALYSIS

With that background, we direct our attention to each of Dean's assignments of error, reciting additional facts as needed.

## 1. COLLATERAL ESTOPPEL

First degree murder, the crime with which Dean was charged, requires premeditation, Neb. Rev. Stat. § 28-303 (Reissue 1989); second degree murder, on the other hand, does not require premeditation, Neb. Rev. Stat. § 28-304 (Reissue 1989). The information alleged that Dean "did kill . . . HAYNES purposely and with deliberate and premeditated malice." Thus, with respect to the first assignment of error, Dean urges that the doctrine of collateral estoppel barred the State from relitigating the issue of Dean's premeditation by virtue of the separate trial in which it was found that Anderson aided and abetted Dean in the commission of second degree murder on a finding that "[a]lthough an intent to kill can be inferred from the actions of . . . Dean under all the circumstances, this court does not feel and does not find that premeditation can be inferred."

### (a) Scope of Review

The applicability of the doctrine of collateral estoppel constitutes a question of law. *Kopecky v. National Farms, Inc.*, 244 Neb. 846, 510 N.W.2d 41 (1994). With regard to such a question, an appellate court is obligated to reach a conclusion independent from the lower court's conclusion. *Id.*

### (b) Doctrine in Criminal Context

"Collateral estoppel" means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties or their privies in any future lawsuit. *Ashe v. Swenson*, 397 U.S. 436, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970); *In re Estate of Wagner, ante* p. 625, 522 N.W.2d 159 (1994). Although first developed in civil litigation, collateral estoppel has become an established rule of federal criminal law since *United States v. Oppenheimer*, 242 U.S. 85, 37 S. Ct. 68, 61 L. Ed. 161 (1916).

This court has also recognized that collateral estoppel may apply in a criminal case. In *State v. Gerdes*, 233 Neb. 528, 446 N.W.2d 224 (1989), a case involving drunk driving, we noted that the doctrine may be applied when an identical issue was decided in a prior action, there was a judgment on the merits which was final, the party against whom the doctrine is to be applied is a party or is in privity with a party to the prior action,

and there was an opportunity to fully and fairly litigate in the prior litigation. We reasoned that the constitutional protection against double jeopardy afforded the doctrine of collateral estoppel to a criminal defendant. *Gerdes* explained that a criminal defendant, relying on collateral estoppel in relation to constitutional protection against double jeopardy in a present proceeding, has the burden to prove that the particular issue which is sought to be relitigated, but which is constitutionally foreclosed by the Double Jeopardy Clause, was necessarily or actually determined in a previously concluded criminal proceeding. See, also, *State v. Long*, 206 Neb. 446, 293 N.W.2d 391 (1980); *State v. Carter*, 205 Neb. 407, 288 N.W.2d 35 (1980).

Citing *State v. Gonzalez*, 75 N.J. 181, 380 A.2d 1128 (1977), Dean argues that in addition to double jeopardy concerns, both federal and state due process requirements make collateral estoppel applicable to his case. After the defendant in *Gonzalez* was indicted, a coindictee's motion to suppress certain evidence was sustained; however, the defendant's similar motion was later overruled. While the New Jersey Supreme Court recognized that collateral estoppel in criminal prosecutions involves different considerations than are involved in civil litigation, it nonetheless ruled that the evidence was to be suppressed in the defendant's case. In so ruling, it wrote:

> Where a defendant makes a convincing showing that he was unable to participate at a prior suppression hearing in which the challenged search was invalidated . . . and the evidence adduced at both hearings is substantially the same, he should be afforded the right to claim the benefits of such a hearing.

*Id.* at 196, 380 A.2d at 1136.

It should be noted, however, that earlier, in *State v. Hubbard*, 123 N.J. Super. 345, 303 A.2d 87 (1973), the New Jersey Supreme Court ruled the fact that in a previous, separate trial an accomplice was found guilty of second degree murder did not mean that Hubbard could not be found guilty of felony murder, robbery, and armed robbery. Hubbard then sought federal habeas corpus relief, contending that the federal Constitution required the application of collateral estoppel so

as to preclude his prosecution for felony murder or the underlying felonies because the first jury must have found there had been no robbery. The contention was rejected by the U.S. Court of Appeals for the Third Circuit in *United States ex rel. Hubbard v. Hatrak*, 588 F.2d 414 (3d Cir. 1978), *cert. denied* 440 U.S. 974, 99 S. Ct. 1541, 59 L. Ed. 2d 792 (1979), which held that the federal Due Process Clause did not impose a collateral estoppel requirement in favor of a criminal defendant who was not a party to the first case.

Noting that in *Gonzalez* the New Jersey Supreme Court carved out a narrow suppression motion exception to the general rule that one seeking to apply collateral estoppel must have been a party to the first proceeding, the Third Circuit advanced several reasons nonmutual collateral estoppel should not apply in a criminal case. Among them is the adverse effect on law enforcement when the state is deprived of the use of evidence which might produce a different outcome in the later proceeding. Furthermore, the extension of collateral estoppel to nonparties may inhibit the grant of criminal defendants' severance motions. The Third Circuit noted that it would be unfortunate if, in the pursuit of fairness with respect to one aspect of the criminal justice process, one were to cause untoward consequences in another. Therefore, the Third Circuit concluded that whatever may be said in favor of the application of collateral estoppel when the criminal defendant is a party to the judgment, the case in favor of such application in favor of nonparties is much less compelling.

Dean also cites *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971), and *United States v. Bruno*, 333 F. Supp. 570 (E.D. Pa. 1971). However, these cases hold that mutuality of estoppel is not a due process requirement, but that the interest of a judicial system in avoiding relitigation is nonetheless a sufficient reason for applying the doctrine of collateral estoppel in favor of a nonparty. *United States ex rel. Hubbard v. Hatrak, supra.*

Dean fails to cite any authority supporting his contention that collateral estoppel is required by the federal Constitution. Indeed, in *Standefer v. United States*, 447 U.S. 10, 100 S. Ct. 1999, 64 L. Ed. 2d 689 (1980), the Court held that despite the

prior acquittal of an Internal Revenue Service agent accused of perpetrating an offense, the government was not barred under the doctrine of nonmutual collateral estoppel from relitigating the issue of whether another agent had aided and abetted the first agent. The Court remarked that the application of nonmutual collateral estoppel in criminal cases is complicated by the rules of evidence and exclusions unique to criminal law. It reasoned that criminal cases involve competing policy considerations which outweigh the economy concerns that undergird the estoppel doctrine. The Court noted that its decision did no more than manifest the "simple, if discomforting, reality that 'different juries may reach different results under any criminal statute. . . .' " *Id.*, 447 U.S. at 25.

Not only do we not find, nor have we been cited to, any authority for the proposition that nonmutual collateral estoppel is afforded a nonparty criminal defendant by the Nebraska Constitution, many state courts have rejected the suggestion that such should be the rule. See, *Com. v. Lewis*, 306 Pa. Super. 81, 452 A.2d 13 (1982) (acquittal of person charged with receiving bribes from defendant charged with corrupt organizations, commercial bribery, and breach of duty to act did not require dismissal of charges); *Commonwealth v. Benson*, 389 Mass. 473, 451 N.E.2d 118 (1983), *cert. denied* 464 U.S. 915, 104 S. Ct. 278, 78 L. Ed. 2d 257 (collateral estoppel only applies in criminal cases where there is mutuality of parties); *State v. Littleton*, 436 So. 2d 500 (La. 1983) (collateral estoppel did not bar state from bringing defendant to trial on charges of conspiracy to commit murder even though state prevented from bringing conspiracy charges against alleged coconspirator); *State v. Jimenez*, 130 Ariz. 138, 634 P.2d 950 (Ariz. 1981) (prosecution of defendant for murder not barred by fact accomplice had been acquitted of murder in separate trial); *State v. Swearingin*, 564 S.W.2d 351 (Mo. App. 1978) (collateral estoppel did not apply to criminal prosecution of defendant on theory certain aspects of separate proceedings against codefendant affected case against defendant); *Timms v. Cupp*, 38 Or. App. 339, 590 P.2d 264 (1979), *review denied* 286 Or. 637 (collateral estoppel cannot be asserted by person other than defendant in original prosecution); *Larsen v. State*, 93

Nev. 397, 566 P.2d 413 (1977) (fact that jury in previous trial found codefendant guilty of first degree kidnapping did not preclude defendant from being convicted of felony murder pursuant to doctrines of res judicata and collateral estoppel); *Woodford v. Municipal Court*, 37 Cal. App. 3d 874, 112 Cal. Rptr. 773 (1974) (prosecution of petitioners with regard to their showing of allegedly obscene film not collaterally estopped due to fact another person had been acquitted in obscenity prosecution pertaining to same film in which scienter was admitted); *State v. Mondrosch*, 108 N.J. Super. 1, 259 A.2d 725 (1969), *cert. denied* 55 N.J. 600, 264 A.2d 71 (1970) (judgment of acquittal against one defendant does not operate as res judicata or collateral estoppel to prosecution of another, although same transaction involved).

(c) Resolution

Accordingly, the first assignment of error must be resolved against Dean.

2. SUPPRESSION MOTION

In the second assignment of error, Dean urges that because Sorensen interviewed him outside the presence of his court-appointed attorney, the trial court erred in refusing to suppress his inculpatory statements.

(a) Scope of Review

We begin by recalling that in determining the correctness of a trial court's ruling on a motion to suppress, an appellate court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994); *State v. Flores*, 245 Neb. 179, 512 N.W.2d 128 (1994). The appellate court will not reweigh or resolve conflicts in the evidence. *State v. Ranson*, 245 Neb. 71, 511 N.W.2d 97 (1994).

(b) Nature of Right to Counsel

The Fifth Amendment to the U.S. Constitution includes the right to be assisted by counsel during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The Sixth Amendment gives one accused of a crime the right to the assistance of counsel. *Gideon v. Wainwright*,

372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). In addition, Neb. Const. art. I, § 11, provides that in all criminal prosecutions, an accused shall have the right to appear and defend in person or by counsel. However, we neither find nor have we had our attention called to any authority holding that the Nebraska Constitution grants a broader right to counsel which requires a more rigorous waiver than that necessary to waive the right to counsel under federal constitutional provisions. Therefore, a waiver of counsel which is effective under the federal Constitution is sufficient to waive the right to counsel under our state Constitution.

The *Miranda* Court determined that the Fifth Amendment's prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant of the right to remain silent and also the right to the presence of an attorney. But an accused may waive those rights provided the waiver is made voluntarily, knowingly, and intelligently. *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986).

It has been held that an effective waiver of an accused's Fifth Amendment right to counsel has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran v. Burbine, supra.* Voluntariness of an admission or confession is determined by the totality of the circumstances. *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993); *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993); *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 676 (1992). Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine, supra.* Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the accused has waived the Fifth Amendment right to counsel. *Id.*

A waiver of the Sixth Amendment right to counsel is valid only when it reflects an intentional relinquishment or abandonment of a known right or privilege. *Johnson v. Zerbst*,

304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). Therefore, the key inquiry is whether one who waived the Sixth Amendment right was sufficiently aware of the right to have counsel present during questioning and of the possible consequences of a decision to forgo the aid of counsel. *Patterson v. Illinois*, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988).

After being told by the police that he had been indicted for murder, the petitioner in *Patterson* twice indicated his willingness to discuss the crime during interviews initiated by the authorities. On both occasions, the petitioner was read a form waiving his *Miranda* rights, which he signed. He then made inculpatory statements and later contended that his Sixth Amendment rights were violated because he did not knowingly and intelligently waive his right to have counsel present during his postindictment questioning. The U.S. Supreme Court acknowledged that the petitioner's Sixth Amendment right to counsel came into existence with his indictment and acknowledged as well that the policies behind the Fifth and Sixth Amendment rights to counsel differ. However, it rejected the notion that one right is superior to or greater than the other, or that it is more difficult to waive the Sixth Amendment right than it is to waive the Fifth Amendment right.

Indeed, it observed that there is no substantial difference between the usefulness of a lawyer during custodial interrogation and during postindictment questioning. Although there was no doubt that the petitioner had the right to the assistance of counsel at his interviews with the authorities, and had he indicated that he wanted counsel's assistance, questioning would have had to stop, the *Miranda* warnings he received adequately informed him of his Sixth Amendment right to have counsel present while being interviewed. The *Patterson* Court thus concluded that the petitioner's postindictment questioning did not violate that right.

### (c) Trial Court's Findings

Here, the evidence is such that the trial court could reasonably find that Dean initiated the interview with Sorensen, Sorensen gave Dean the *Miranda* warnings, Dean

understood them, and Dean desired to talk with Sorensen outside the presence of his attorney. There being no evidence of coercion or force by the authorities in an effort to obtain a statement from Dean, under the totality of the circumstances, it cannot be said that the trial court's finding that Dean made a voluntary, knowing, and intelligent waiver of his Fifth and Sixth Amendment rights to counsel is clearly erroneous.

### (d) Resolution

Thus, the second assignment of error must also be resolved against Dean.

### 3. Receipt of Evidence

The third assignment of error rests on Dean's claim that the trial court should not have admitted in evidence the State's laser trajectory analysis of the fatal bullet's path because the State failed to establish that such analysis is generally accepted in the relevant scientific community as scientifically valid.

### (a) Scope of Review

The admission of expert testimony is ordinarily within the discretion of the trial court, and its ruling will be upheld in the absence of an abuse of discretion. *State v. Borchardt*, 224 Neb. 47, 395 N.W.2d 551 (1986).

### (b) Novel Scientific Evidence

Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1989), provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

When the proffered opinion evidence relates to a topic which has been judicially recognized as a proper subject for expert testimony, the court need only consider whether this evidence will aid the jury in deciding the particular issues in the case. 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 702[03] (1994). However, when a court is faced with an offer of a novel form of expertise which has not yet received judicial sanction, an initial inquiry is in order: Is this new technique or principle sufficiently reliable so that it will aid the jury in

reaching accurate results?

In accordance with *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), we have held that the admissibility of an expert's testimony, including an opinion, which is based on a scientific principle or is based on a technique or process which utilizes or applies a scientific principle, depends on general acceptance of the principle, technique, or process in the relevant scientific community. *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990). Recently, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, \_\_\_\_ U.S. \_\_\_\_, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the U.S. Supreme Court, under the provisions of Fed. R. Evid. 702, announced an arguably more flexible "reliability standard" for the admission of scientific expert evidence. However, notwithstanding that our rule 702 parallels the federal rule 702, *Daubert* does not apply to state court decisions. The increasing prevalence of expert evidence cautions against the admission of scientific evidence which is still the subject of dispute and controversy in the relevant scientific communities. See, also, *State v. Cauthron*, 120 Wash. 2d 879, 846 P.2d 502 (1993); *Fishback v. People*, 851 P.2d 884 (Colo. 1993); *State v. Vandebogart (DNA)*, 136 N.H. 365, 616 A.2d 483 (1992). We thus adhere to the *Frye* standard, under which the proponent of the evidence must prove general acceptance by surveying scientific publications, judicial decisions, or practical applications, or by presenting testimony from scientists as to the attitudes of their fellow scientists. See, *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992); 1 McCormick on Evidence § 203 (John W. Strong 4th ed. 1992). Moreover, evidence of a test result cannot be characterized as "scientific" or qualify as "technical or other specialized knowledge," and thus within the purview of § 27-702, unless and until it is established that the test result demonstrates what it is claimed to demonstrate. *State v. Borchardt, supra.*

Dean argues that laser trajectory is novel scientific evidence which required the State to establish that the underlying scientific principle or technique was generally accepted within the relevant scientific community before such evidence was admissible. He further contends that the State failed to provide sufficient evidence concerning the general acceptance of such a

technique. Therefore, Dean urges that the testimony regarding the firearms examiner's use of the laser beam at the crime scene was inadmissible because the foundation for its receipt was lacking.

However, various trial courts have readily admitted crime scene reconstruction evidence that included the insertion of dowels, rods, or strings through bullet holes to demonstrate a bullet's path. See, *Vasquez v. Hernandez*, No. 91 C 4088, 1994 WL 201092 (N.D. Ill. May 18, 1994) (memorandum opinion) (laser trajectory system used to determine where bullets originated); *Sizemore v. State*, 251 Ga. 867, 310 S.E.2d 227 (1984) (officer testified he positioned string through bullet holes to demonstrate bullet's path); *Pruitt v. State*, 232 Ala. 421, 168 So. 149 (1936) (no error in allowing witness to testify he placed a pencil in bullet hole to see direction it entered); *State v. Dunn*, 824 S.W.2d 533 (Mo. App. 1992) (defendant's lawyer testified he checked state's theory of bullet trajectory by attaching string between bullet holes); *Quinlivan v. State*, 627 So. 2d 1082 (Ala. Crim. App. 1992) (investigator testified he ran string through bullet holes demonstrating bullet's path); *People v. Ross*, 201 Cal. App. 3d 1232, 247 Cal. Rptr. 827 (1988) (police officer permitted to testify he used laser to reconstruct path of bullets to determine gunman's location); *Smith v. State*, 466 So. 2d 1026 (Ala. Crim. App. 1985) (officer testified he attached string between bullet hole and bullet ricochet mark); *Ivey v. State*, 369 So. 2d 1276 (Ala. Crim. App. 1979) (permitted use of life-size mannequin with steel rod positioned to demonstrate bullet's path through entrance and exit wound was not abuse of discretion); *Cherry v. State*, 488 S.W.2d 744 (Tex. Crim. App. 1972), *cert. denied* 411 U.S. 909, 93 S. Ct. 1538, 36 L. Ed. 2d 199 (1973) (officer testified he and another officer inserted pencils through bullet holes to determine angle, then attached strings to pencils between bullet holes to demonstrate trajectories of bullets).

Nebraska is no exception. In *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993), the trial court admitted evidence concerning the reconstruction by police of the paths taken by bullets, which included the placing of rods through bullet holes to determine the angle from which the bullets were fired.

The firearms examiner testified that the use of lasers to reconstruct bullet trajectories is accepted among firearms examiners. The record demonstrates that the fact a laser beam travels in a straight line is common knowledge. Therefore, aiming a laser beam through bullet holes to reconstruct a bullet's path is no less reliable than inserting a dowel into a bullet hole to demonstrate its path. In short, laser trajectory analysis is not the type of novel scientific evidence that lacks judicial sanction because of questionable reliability or validity such as is the case with polygraphs, horizontal nystagmus tests, hypnosis to refresh a witness' recollection, or certain aspects of deoxyribonucleic acid profiling. See, *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992); *State v. Borchardt*, 224 Neb. 47, 395 N.W.2d 551 (1986); *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648 (1981), *cert. denied* 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 157 (1987); *Boeche v. State*, 151 Neb. 368, 37 N.W.2d 593 (1949).

### (c) Resolution

Therefore, the third assignment of error, too, must be resolved against Dean.

### 4. MALICE ELEMENT

The fourth assignment of error rests on the fact that the trial court, in acquiescing to Dean's request that it make specific findings, failed to specifically state that it found Dean to have acted with malice.

Malice is an essential element of murder in the second degree. *State v. Martin, post* p. 896, 524 N.W.2d 58 (1994); *State v. Manzer, ante* p. 536, 519 N.W.2d 558 (1994). The finding in question states only that the "killing of the decedent was intentionally done in that it was done willfully or purposely and not accidentally or involuntarily."

### (a) Scope of Review

Whether malice existed is unquestionably a factual issue. See *State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994) (jury instruction failing to include malice as element of second degree murder prejudicially erroneous). However, whether a finding is sufficient to support a judgment is a question of law. See

*Cochran v. Cochran*, 62 Neb. 450, 87 N.W. 152 (1901) (if fraudulent intent inferable from facts, judgment will not be reversed because trial court failed to state in finding that such intent existed).

(b) Sufficiency of Finding

Like intent, malice concerns the killer's state of mind and may thus be inferred from the words and acts of the defendant, the circumstances surrounding his or her conduct, and the evidence relating to the circumstances of the criminal act. *State v. Thompson, supra.* Malice is that condition of the mind which is manifested by the intentional doing of a wrongful act without just cause or excuse. *Id.*

The evidence is that Dean meant to and did fire a high-powered rifle into the lighted portion of a trailer at a time when an automobile was parked nearby. Thus, the direct evidence is that Dean fired the rifle "intentionally," as expressly required by § 28-304, and it can be inferred from the surrounding circumstances that he did so with malice, for he intentionally did a wrongful act. That is, he pointed and shot into an area where he could reasonably have expected someone to be, without cause or excuse for doing so. See *State v. Bachkora*, 229 Neb. 421, 427 N.W.2d 71 (1988) (pointing gun at another unlawful for purpose of manslaughter statute). Accord *Ford v. State*, 71 Neb. 246, 98 N.W. 807 (1904).

That the trial court did not expressly state it found the existence of malice does not require a reversal of its judgment. In *Cochran v. Cochran, supra,* the trial court entered a decree directing the sale of certain land for the payment of alimony. The decree was attacked on the basis that it did not find that the purchaser had acquired the land with knowledge of the seller's fraudulent intent. This court stated, however, that while the words "fraudulent intent" did not appear in the finding, the facts were such that fraudulent intent must have existed, and held that the decree was justified.

Although *Cochran* is a civil case, the reasoning is equally applicable to a criminal case. It serves no purpose to reverse a conviction because a trial court acting as the trier of fact neglected to specifically mention the requisite mental state

where the evidence establishes the existence of the mental state and the other findings are sufficient to imply its presence.

For example, in *People v Rushlow*, 179 Mich. App. 172, 445 N.W.2d 222 (1989), the lower court in a bench trial rejected the defendant's theory of accident or self-defense, found that the victim died of stab wounds at the hands of the defendant, and found that there was no justification or excuse for the killing. Although the lower court did not make a specific finding on the issue of malice, it concluded that the elements of second degree murder had been established beyond a reasonable doubt and so adjudged the defendant. Under those circumstances, the appellate court concluded that the totality of the findings was sufficient to support the conviction.

In charging the defendant with aggravated assault, the prosecution in *De Leon v. State*, 865 S.W.2d 139 (Tex. App. 1993), alleged that he had used a knife capable of causing serious bodily injury. In affirming, notwithstanding the lower court's failure to expressly find that the defendant had used a deadly weapon, the reviewing court reasoned that such finding was implied in the finding that the defendant was guilty as charged.

Likewise, the reviewing court, in *People v. Gutierrez*, 105 Ill. App. 3d 1059, 433 N.E.2d 361 (1982), concluded the mere fact that the lower court failed to mention until sentencing that the defendant had knowledge of the accident did not indicate the defendant had been found guilty of leaving the scene without consideration of the state of his knowledge.

### (c) Resolution

The fourth assignment of error is therefore resolved against Dean as well.

### 5. SUFFICIENCY OF EVIDENCE

In the fifth and last assignment of error, Dean asserts the evidence was, in any event, insufficient to sustain the trial court's judgment. He urges that when a criminal prosecution is premised on circumstantial evidence, any fact or circumstance susceptible of two interpretations must be resolved in favor of the accused. He claims that only circumstantial evidence exists to support a finding of an intentional killing, whereas there was

direct countervailing evidence in the form of testimony from a participant-witness that the gunmen did not intend to kill anyone.

## (a) Scope of Review

A conviction in a bench trial of a criminal case must be sustained on appeal if the evidence, viewed and construed in the light most favorable to the State, is legally sufficient to support that conviction. *State v. Winchester*, 239 Neb. 535, 476 N.W.2d 862 (1991).

In determining whether evidence is sufficient to sustain a conviction in a bench trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence. *State v. Russell*, 243 Neb. 106, 497 N.W.2d 393 (1993).

## (b) Nature of Evidence

It is true that where only circumstantial evidence exists to support a conviction and the evidence is reasonably susceptible of two interpretations, one of guilt and the other of nonguilt and neither inference is stronger, for the purpose of determining whether the State has made a prima facie case, and for that purpose only, the inferences are to be viewed most favorably to the accused. See, *State v. Mowry*, 245 Neb. 213, 512 N.W.2d 140 (1994); *State v. Covarrubias*, 244 Neb. 366, 507 N.W.2d 248 (1993). See, also, *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992); *State v. LaFreniere*, 240 Neb. 258, 481 N.W.2d 412 (1992).

But this is not such a case, for here not only was there evidence of Dean's admission that he intentionally shot into the trailer, two witnesses testified that they had reason to suspect that someone was in the trailer at the time of the shooting. Williams testified that he thought he saw someone in the window of the trailer and said so, but was unsure whether anyone heard him. Pool, one of the gunmen, testified that he saw someone peek out the front window before he and other participants parked their automobile and handed out the guns. Such testimony is direct evidence that someone was inside the trailer. *State v. Sexton, supra* (direct evidence is proof of facts

by witnesses who saw acts done or heard words spoken). Indeed, we declare here and now that evidence that one, intentionally and with malice, shot into a residence, lighted or unlighted, and that a death resulted is, in and of itself, sufficient to establish murder in the second degree.

### (c) Resolution

Thus, as were the preceding assignments of error, the fifth and final assignment is resolved against Dean.

### IV. JUDGMENT

Inasmuch as the record fails to sustain any of Dean's assignments of error, the trial court's judgment is, as first stated in part I, affirmed.

AFFIRMED.

WRIGHT, J., concurring in part, and in part dissenting.

I concur in the result. However, I continue to disagree with the majority's determination that malice is an essential element of second degree murder. See *State v. Grimes, ante* p. 473, 519 N.W.2d 507 (1994) (Wright, J., dissenting).