STATE OF NEBRASKA, APPELLEE, V. THREE THOUSAND SIXTY
SEVEN DOLLARS AND SIXTY-FIVE CENTS ($3,067.65) IN U.S.
CURRENCY, APPELLEE, AND DIANA APPLEGATE,
INTERVENOR–APPELLANT.

545 N.W.2d 129

Filed March 19, 1996.   No. A–94–939.

James R. Hancock, of Hancock & Denton, P.C., for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

MILLER–LERMAN, Chief Judge, and IRWIN and MUES, Judges.

MILLER–LERMAN, Chief Judge.

Diana Applegate appeals the order of the district court for Scotts Bluff County, Nebraska, sustaining the petition of the State of Nebraska under Neb. Rev. Stat. § 28–431(4) (Reissue 1989) to forfeit cash seized from Henry Rein, which money Applegate claims belongs to her. For the reasons recited below, we affirm.

## FACTS

At issue in this case is the ownership and forfeiture of certain cash in the amount of $3,067.65 seized from Henry Rein on June 8, 1994, when he was arrested and subsequently charged with possessing with intent to deliver marijuana, in violation of Neb. Rev. Stat. §§ 28–416 (Cum. Supp. 1994) and 28–405 (Cum. Supp. 1992); driving while under the influence of alcohol (DUI), in violation of Neb. Rev. Stat. § 60–6,196 (Reissue 1993), and being a habitual criminal under Neb. Rev. Stat. § 29–2221 (Cum. Supp. 1994). For the sake of completeness, we note that pursuant to a plea agreement, on July 28,

1994, Rein pled no contest to the drug charges, and the State dismissed the DUI and habitual criminal charges.

On June 9, 1994, the State initiated forfeiture proceedings in regard to the cash found in Rein's possession. Although the caption on many of the pleadings in this case indicates that the amount in question is $3,068.65, we note that the correct amount is $3,067.65 and that the State amended its petition to make this correction.

The hearing on the forfeiture was held in the district court for Scotts Bluff County on August 24, 1994. At the hearing, the State presented its case, consisting of the testimony of five law enforcement officers and one State Patrol chemist, all of whom were involved in either the arrest of Rein or the analysis of the substances and cash taken from his possession at the time of his arrest. The forfeiture proceeding was opposed by Diana Applegate, Rein's girl friend, on the basis that the cash subject to forfeiture belonged to her. Applegate and Rein testified on behalf of Applegate's opposition to the forfeiture.·

The State's case essentially revolved around the circumstances surrounding the June 8, 1994, arrest of Rein and the seizure of the $3,067.65 in his possession at the time of his arrest. The State's witnesses described the events of June 8 as follows: In the early morning hours of June 8, Officer Stanley Lucke of the city of Scottsbluff Police Department observed a car without taillights traveling at a speed which appeared to be in excess of the posted speed limit of 30 miles per hour. Officer Lucke attempted to catch up with and stop the car, but lost track of it in a residential area. Later that morning, at approximately 1:30, Officer Lucke again caught sight of the car and proceeded to pull the driver over. After stopping the car, Officer Lucke made contact with the driver and sole occupant of the car, Rein. Officer Lucke observed that Rein smelled of alcohol and had bloodshot eyes. Officer Lucke arrested Rein for DUI after Rein failed several field sobriety tests.

Officer William Baker, also of the Scottsbluff Police Department, arrived on the scene during the time Officer Lucke was administering the field sobriety tests to Rein. After Officer Lucke arrested Rein, Officer Baker began the impound inventory of Rein's vehicle. Underneath the front passenger seat

of the vehicle, Officer Baker found a white Wal–Mart bag which contained a large plastic bag holding 13 smaller plastic bags with "plant material in them." Officer Terry Dishman then directed Hondo, a "drug dog," to sniff the vehicle for the presence of controlled substances. Hondo alerted the officers to a pipe containing a substance later determined to be marijuana residue.

Officer Lucke then transported Rein to the county jail. Officer Lucke testified that on the way to the jail Rein complained that he "was being picked on" and that "he was just trying to make a living [selling] the marijuana." After administering a test of Rein's breath, Officer Lucke transported Rein to the booking area of the jail, where the jailer took Rein's wallet and counted the money twice. Officer Lucke testified that the wallet contained three $1,000 bundles of cash, each bundle composed of both $100 bills and a few $20 bills, and that Rein also had some loose dollars and change in other pockets. Officer Lucke testified that he never discussed with Rein where Rein had acquired all the cash and, specifically, that Rein never told Officer Lucke that the money belonged to Applegate.

Officer Lucke then turned the cash over to Officer Lynn Kemper, who requested that Officer Dishman direct Hondo to sniff the cash taken from Rein. Accordingly, Officer Dishman placed Rein's cash on the floor in a pile and placed $60 of his own money next to Rein's cash. Hondo walked over Officer Dishman's money to Rein's cash, scratched at the bundled cash taken from Rein, and grabbed one of the cash bundles in his mouth, indicating that it smelled of a controlled substance.

In regard to the nature of the substance contained in the plastic bags found in Rein's vehicle, Jon Shay, a chemist with the Nebraska State Patrol, testified that he tested the substance and determined it to be marijuana. Shay also opined that two hand–rolled cigarettes and the pipe found in Rein's vehicle all contained marijuana. Officer Kemper testified that the individual bags of marijuana were packaged in various weights, which indicated that they were intended for resale, as opposed to personal use, and that the street value of the marijuana was $1,400.

After the State rested its case, Applegate took the stand. Applegate testified that the money seized from Rein belonged to her. Applegate explained that she did not work, but that she had recently inherited $5,468 from her father's estate. She testified that when she received the inheritance check she cashed the entire amount at her "mother's bank" because she did not have her own bank account. Applegate could not remember the name of the bank at which she cashed the check or the name of the teller who cashed the check for her. Applegate testified that when she cashed the check, the teller gave her 5 $1,000 bundles, each composed of 10 $100 bills, and $468 in various, unbanded bills. However, in contrast to Applegate's testimony, the record indicates that the banded cash seized from Rein was received from different tellers at different times.

Applegate testified that after she cashed the check she used the money to pay rent and outstanding bills. Specifically, Applegate stated that she "paid out totally a good couple of thousand, probably" for various bills. Applegate said that she did not have or could not produce receipts for the bills she paid with the estate cash. Applegate testified that she gave the remaining cash to Rein to hold for her because she had a tendency to lose money. According to Applegate's testimony, she gave Rein the bank envelope containing the three $1,000 bundles, still in the original bands from the bank, and, possibly, some odd cash.

Applegate testified on direct examination that she did not know that Rein was involved in the sale or use of narcotics. However, on cross-examination, she conceded that she knew Rein had previously been convicted of and was on parole for possession of marijuana with intent to deliver and that at her request, during his parole term, Rein had given her some marijuana, which had previously been found in her home.

Applegate described the events of the night of June 7, 1994, and the early morning hours of June 8, leading up to the time of Rein's arrest. She stated that Rein had picked her up at her house at about 5 or 6 p.m. and that they went "[t]o the bars." Applegate mentioned a few bars they had stopped at that evening, but she could not remember exactly when or how long they were at each, or if they went anywhere else. Applegate

testified that she was with Rein the entire evening and that he "might have had a drink," but that she could not remember at which bar this occurred. Applegate acknowledged that she knew that drinking alcohol was a violation of Rein's parole.

Applegate testified that after they went to a few bars, she and Rein stopped at James Zitterkopf's residence. Evidently, Applegate wanted to stay at Zitterkopf's, Rein did not want to stay, an argument between them ensued, and Rein left her at Zitterkopf's with no ride home and with all of her money in his possession. Apparently, Rein was pulled over and arrested after he left Zitterkopf's.

Rein testified on Applegate's behalf, and his explanation of the source and use of the money and his description of the events of the evening of June 7, 1994, and the morning of June 8 were consistent with Applegate's account. In describing his personal financial situation, Rein testified that he worked several jobs and brought home approximately $200 per week. Rein stated that he had held Applegate's money for 7 days before his arrest on June 8. Rein explained that he and Applegate had agreed that Rein would keep the money for Applegate, but that she could draw from the money in any amount at any time. Rein testified that he did not tamper with two of the three $1,000 bundles of $100 bills, which should have still been intact at the time of his arrest.

At the conclusion of the evidence, the parties submitted the case to the court for determination. On September 13, 1994, the court issued an order of forfeiture, stating in part:

> The court finds beyond a reasonable doubt that Mr. Rein possessed the $3,000 with the intent of facilitating violations of Article 4, Chapter 28 of the Nebraska Statutes. . . . It is apparent that Mr. Rein was able to make a quantity purchase of marijuana shortly before his arrest. There is also no explanation that he had the means to pay for it, unless he used this resource. The cash has obviously been tampered with because it is no longer clean crisp $100 bills. It is the sort of seed money needed by a drug dealer to make quantity purchases whenever supplies become available, and all reasonable inferences point to

the fact that Mr. Rein intended to continue his enterprise of selling marijuana, financed in part with this money. The court sustained the State's petition for forfeiture to the extent of the $3,000 in bundled cash and denied the petition as to the remaining cash in the amount of $67.65. The portion of the order denying the forfeiture as to $67.65 is not on appeal to this court. Applegate appeals.

## ASSIGNMENTS OF ERROR

Applegate variously assigns five errors, which we distill as follows: The district court erred in ordering a forfeiture of the $3,000 because (1) Applegate proved by a preponderance of the evidence that the $3,000 was hers and was neither used nor intended for use to facilitate a violation of chapter 28, article 4, of the Nebraska Revised Statutes and (2) the State failed to establish beyond a reasonable doubt that the cash in question was used or intended for use to facilitate a violation of article 4.

## STANDARD OF REVIEW

*Analysis.*

■ In *State v. One 1986 Toyota 4-Runner*, 1 Neb. App. 1138, 510 N.W.2d 556 (1993), this court distinguished the nature of a forfeiture case brought under Neb. Rev. Stat. § 28-1111 (Reissue 1989), which relates to the forfeiture of gambling devices, an action considered civil and remedial in nature, and the nature of a forfeiture case brought under § 28-431 such as the instant case. This court explained in *One 1986 Toyota 4-Runner* that a § 28-431 forfeiture relates to items which are not contraband per se, as are gambling devices, but which are ordinary, legal items used to facilitate drug transactions. For this reason, § 28-431 forfeitures are considered punitive and criminal in nature. Although *One 1986 Toyota 4-Runner* involves the forfeiture of a motor vehicle, as opposed to the forfeiture of money, it refers to the criminal and punitive nature of § 28-431 forfeitures in general.

■ The Nebraska Supreme Court has recently held that appellate review of the sufficiency of the evidence to support a forfeiture of a motor vehicle under § 28-431(4) is to be treated the same as the review of the sufficiency of the evidence in the

appeal of a criminal case. *State v. One 1985 Mercedes 190D Automobile*, 247 Neb. 335, 526 N.W.2d 657 (1995). See, also, *State v. 1987 Jeep Wagoneer*, 241 Neb. 397, 488 N.W.2d 546 (1992); *State v. One 1987 Toyota Pickup*, 233 Neb. 670, 447 N.W.2d 243 (1989). Although the Nebraska Supreme Court has specifically delineated the standard of appellate review for forfeitures of motor vehicles, and not for forfeiture of money, we believe that the standard of review for forfeiture of motor vehicles applies to money because the forfeiture procedure for both is set forth under the same statutory subsection. Specifically, subsection (4) of § 28-431, which authorizes and describes the procedure for forfeiture of both (1) vehicles and vessels used or intended to be used to transport controlled substances and (2) money used or intended to be used to facilitate violations of controlled substance laws, controls the instant case. For the sake of completeness, we note that "use" of an object in the commission of a crime, either as a separate crime or as a basis for forfeiture of the object, is generally controlled by statute. Compare *Bailey v. U.S.*, ____ U.S. ____, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995) (holding that "use" of a firearm under 18 U.S.C. § 924(c)(1) (1994) requires more than mere possession at the time of the commission of the crime).

Pursuant to the foregoing, we will apply the standard of review used in criminal cases.

*Application.*

In determining whether evidence is sufficient to sustain a conviction in a bench trial of a criminal case, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, all of which are within a fact finder's province for disposition. *State v. Kunath*, 248 Neb. 1010, 540 N.W.2d 587 (1995); *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994); *State v. Russell*, 243 Neb. 106, 497 N.W.2d 393 (1993). The trial court's findings have the effect of a verdict and will not be set aside unless clearly erroneous. *State v. Simants*, 248 Neb. 581, 537 N.W.2d 346 (1995); *State v. Masters*, 246 Neb. 1018, 524 N.W.2d 342 (1994).

■ In this case, the evidence is both direct and circumstantial. In a § 28–431 forfeiture case, when there is both circumstantial and direct evidence, the circumstantial evidence is to be treated the same as direct evidence, and upon review, the State is entitled to have all conflicting evidence, both direct and circumstantial, and all reasonable inferences which can be drawn therefrom, viewed in its favor. *One 1985 Mercedes 190D Automobile, supra*; *1987 Jeep Wagoneer, supra*.

## ANALYSIS
*Forfeiture Procedure Under § 28–431.*

■ Section 28–431 provides the terms by which the State may proceed against seized property by filing a petition for forfeiture and additionally sets forth two avenues by which a purported owner or claimant may prevent forfeiture of the property. The statutory language of the first method of forfeiture prevention allows the "*owner of record* of such property" to petition the district court to release such property upon "a showing by the owner that he or she had no knowledge that such property was being used in violation of this article." (Emphasis supplied.) § 28–431(4). Cf. *Bennis v. Michigan*, ___ U.S. ___, 116 S. Ct. 994, 134 L. Ed. 2d 168 (1996) (holding that owner's interest in automobile may be forfeited by reason of use to which automobile is put, even though owner did not know that it was to be put to such use). Because money cannot have an "owner of record," the first method of prevention appears to be inapplicable in this case.

The second method of preventing forfeiture under § 28–431(4) provides that any person having an interest in the property proceeded against or any person against whom civil or criminal liability could lie if the property is found to be in violation of this article (the claimant) may within 30 days of the State's petition appear and file an answer or demur to the petition, alleging his or her interest in the property. The court will then hold a hearing to determine whether or not the property shall be forfeited to the State.

Section 28–431(4) further provides:

> If the claimant proves by a preponderance of the evidence that he or she (a) has not used or intended to use the

property to facilitate an offense in violation of this article, (b) has an interest in such property as owner or lienor or otherwise, acquired by him or her in good faith, and (c) at no time had any knowledge that such property was being or would be used in, or to facilitate, the violation of this article, the court shall order that such property or the value of the claimant's interest in such property be returned to the claimant. If there are no claims, if all claims are denied, or if the value of the property exceeds all claims granted and it is shown beyond a reasonable doubt that such property was used in violation of this article, the court shall order [forfeiture of such property].

References in § 28–431 to "violation[s] of this article [4]" generally refer to violations of laws relating to controlled substances.

*Application of Applegate's Burden of Proof.*

■ To prevent forfeiture of the seized money, § 28–431 required Applegate to prove by a preponderance of the evidence that (1) the money was not used or intended for use to facilitate an article 4 violation, (2) she was the owner of the money and acquired such money in good faith, and (3) she at no time had any knowledge that the money was being or would be used to facilitate an article 4 violation.

In her petition for return of the seized money, Applegate alleges that the money belonged to her, being the balance of a distribution from her father's estate and only temporarily in Rein's possession, and that the money was never, to her knowledge, used or intended to be used to facilitate an article 4 violation. Applegate and Rein testified at the hearing in a manner consistent with these contentions. However, we note that their testimony included both internal inconsistencies and statements inconsistent with the testimony of the State's witnesses.

The testimony of Applegate and Rein was the only evidence of Applegate's claims that the money was not, and was never intended to be, used to facilitate a drug transaction and, alternatively, that she had no knowledge of such intent or use. The district court specifically stated that it "disbelieve[d] the

story given by Ms. Applegate and Mr. Rein" and, therefore, found that Applegate had not met her burden of proof.

The key issue in applying Applegate's burden of proof is whether or not Applegate proved by a preponderance of the evidence that she had no knowledge of Rein's intent, if any, to use the money to facilitate a drug transaction. In this regard, we note that knowledge may be inferred from the circumstances surrounding the act. *State v. LaFreniere*, 240 Neb. 258, 481 N.W.2d 412 (1992); *State v. Mills*, 199 Neb. 295, 258 N.W.2d 628 (1977). Applegate acknowledged during her testimony that she was aware of Rein's history of selling marijuana and that Rein had provided her with marijuana at her request. Applegate's admitted awareness of Rein's previous drug-related activities indicates that any actual lack of knowledge on her part of Rein's intended use of the money could be categorized as "willful blindness." See *State v. LaFreniere*, 240 Neb. at 263, 481 N.W.2d at 415 (citing Model Penal Code's "willful blindness" definition of criminal "knowledge," under which "the actor 'is aware of the probable existence of a material fact but does not determine whether it exists or does not exist'").

Pursuant to the applicable standard of review, we do not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, all of which are within a fact finder's province for disposition. *State v. Kunath*, 248 Neb. 1010, 540 N.W.2d 587 (1995); *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994); *State v. Russell*, 243 Neb. 106, 497 N.W.2d 393 (1993). The district court did not believe Applegate's testimony relating to her lack of knowledge and properly inferred Applegate's knowledge from the surrounding circumstances. Our review of the record indicates that the district court's determination that Applegate failed to prove by a preponderance of the evidence that she was entitled to the return of the money was not clearly erroneous.

*Application of State's Burden of Proof.*

We now address whether or not the State presented evidence which proved beyond a reasonable doubt that Rein used or intended to use the money to purchase marijuana with intent to deliver, in violation of §§ 28-416 and 28-405.

When Officer Lucke arrested Rein, Rein was in possession of 1,400 dollars' worth of marijuana packaged for resale, two marijuana cigarettes, and a pipe containing marijuana. Rein also possessed the $3,000 in question, which money he claims was not used to purchase and was not related in any way to the marijuana found in his vehicle. The record shows that Hondo, the drug detection dog, indicated by his trained sense of smell that the money in question smelled of marijuana. Rein stated in connection with his arrest that he made a living selling marijuana. Applegate, the claimant, admitted she knew that Rein had a criminal history of dealing marijuana and that he had recently supplied her with marijuana. The district court found that the money in question was "the sort of seed money needed by a drug dealer to make quantity purchases whenever supplies become available" and that Rein had no "means to pay for [the marijuana], unless he used this resource."

Section 28–431 authorizes forfeiture of money where the State shows beyond a reasonable doubt that the money was used or was intended to be used to facilitate a violation of the controlled substance laws. The thrust of the State's case was that the $3,000 was intended to be used to facilitate a violation of the controlled substance laws. Intent in a criminal case can be proven by circumstantial evidence. *Kunath, supra; State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995); *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995). Our review shows that the State established intent beyond a reasonable doubt.

From all the relevant direct and circumstantial evidence in this case and the inferences that can be drawn therefrom in favor of the State, we do not believe the district court's findings are clearly erroneous. See, *State v. Simants*, 248 Neb. 581, 537 N.W.2d 346 (1995); *State v. One 1985 Mercedes 190D Automobile*, 247 Neb. 335, 526 N.W.2d 657 (1995). We find that there was sufficient evidence for the district court to find beyond a reasonable doubt that Rein used or intended to use the money in question to facilitate a transaction involving the purchase or sale of marijuana.

## CONCLUSION

Pursuant to the foregoing, we conclude that the district court correctly determined that Applegate failed to prove by a preponderance of the evidence that the money in question belonged to her and that it was not used or intended to be used to facilitate the purchase or sale of marijuana, or that if it was intended to be or was so used, she had no such knowledge. We further find that the district court properly found beyond a reasonable doubt that Rein used or intended to use the money to facilitate the purchase or sale of marijuana. Therefore, we affirm the order of the district court forfeiting to the State $3,000 of the money seized from Rein.

AFFIRMED.